# JACOBSON *v.* MASSACHUSETTS.

ERROR TO THE SUPREME COURT OF THE STATE OF MASSA-
CHUSETTS.

No. 70.  Argued December 6, 1904.—Decided February 20, 1905.

The United States does not derive any of its substantive powers from the
Preamble of the Constitution.   It cannot exert any power to secure the
declared objects of the Constitution unless, apart from the Preamble
such power be found in, or can properly be implied from, some express
delegation-in the instrument.

While the spirit of the Constitution is to be respected not less than its
letter, the spirit is to be collected chiefly from its words.

While the exclusion of evidence in the state court in a case involving the
constitutionality of a state statute may not strictly present a Federal
question, this court may consider the rejection of such evidence upon
the ground of incompetency. or immateriality under the statute as
showing its scope and meaning in the opinion of the state court.

The police power of a State embraces such reasonable regulations relating
to matters completely within its territory, and not affecting the people
of other States, established directly by legislative enactment, as will
protect the public health and safety.

While a local regulation, even if based on the acknowledged police power
of a State, must always yield in case of conflict with the exercise by the
General Government of any power it possesses under the Constitution,
the mode or manner of exercising its police power is wholly within the
discretion of the State so long as the Constitution of the United States
is not contravened, or any right granted or secured thereby is not
infringed, or not exercised in such an arbitrary and oppressive man-
ner as to justify the interference of the courts to prevent wrong and
oppression.

The liberty secured by the Constitution of the United States does not
import an absolute right in each person to be at all times, and in all
circumstances wholly freed from restraint, nor is it an element in such
liberty that one person, or a minority of persons residing in any com-
munity and enjoying the benefits of its local government, should have
power to dominate the majority when supported in their action by the
authority of the State.

It is within the police power of a State to enact a compulsory vaccination
law, and it is for the legislature, and not for the courts, to determine

in the first instance whether vaccination is or is not the best mode for the prevention of smallpox and the protection of the public health.

There being obvious reasons for such exception, the fact that children, under certain circumstances, are excepted from the operation of the law does not deny the equal protection of the laws to adults if the statute is applicable equally to all adults in like condition.

The highest court of Massachusetts not having held that the compulsory vaccination law of that State establishes the absolute rule that an adult must be vaccinated even if he is not a fit subject at the time or that vaccination would, seriously injure his health or cause his death, this court holds that as to an adult residing in the community, and a fit subject of vaccination, the statute is not invalid as in derogation of any of the rights of such person under the Fourteenth Amendment.

THIS case involves the validity, under the Constitution of the United States, of certain provisions in the statutes of Massachusetts relating to vaccination.

The Revised Laws of that Commonwealth, c. 75, § 137, provide that "the board of health of a city or town if, in its opinion, it is necessary for the public health or safety shall require and enforce the vaccination and revaccination of all the inhabitants thereof and shall provide them with the means of free vaccination. Whoever, being over twenty-one years of age and not under guardianship, refuses or neglects to comply with such requirement shall forfeit five dollars."

An exception is made in favor of "children who present a certificate, signed by a registered physician that they are unfit subjects for vaccination." § 139.

Proceeding under the above statutes, the Board of Health of the city of Cambridge, Massachusetts, on the twenty-seventh day of February, 1902, adopted the following regulation: "Whereas, smallpox has been prevalent to some extent in the city of Cambridge and still continues to increase; and whereas, it is necessary for the speedy extermination of the disease, that all persons not protected by vaccination should be vaccinated; and whereas, in the opinion of the board, the public health and safety require the vaccination or revaccination of all the inhabitants of Cambridge; be it ordered, that

all the inhabitants of the city who have not been successfully vaccinated since March 1, 1897, be vaccinated or revaccinated."

Subsequently, the Board adopted an additional regulation empowering a named physician to enforce the vaccination of persons as directed by the Board at its special meeting of February 27.

The above regulations being in force, the plaintiff in error, Jacobson, was proceeded against by a criminal complaint in one of the inferior courts of Massachusetts. The complaint charged that on the seventeenth day of July, 1902, the Board of Health of Cambridge, being of the opinion that it was necessary for the public health and safety, required the vaccination and revaccination of all the inhabitants thereof who had not been successfully vaccinated since the first day of March, 1897, and provided them with the means of free vaccination, and that the defendant, being over twenty-one years of age and not under guardianship, refused and neglected to comply with such requirement.

The defendant, having been arraigned, pleaded not guilty. The government put in evidence the above regulations adopted by the Board of Health and made proof tending to show that its chairman informed the defendant that by refusing to be vaccinated he would incur the penalty provided by the statute, and would be prosecuted therefor; that he offered to vaccinate the defendant without expense to him; and that the offer was declined and defendant refused to be vaccinated.

The prosecution having introduced no other evidence, the defendant made numerous offers of proof. But the trial court ruled that each and all of the facts offered to be proved by the defendant were immaterial, and excluded all proof of them.

The defendant, standing upon his offers of proof, and introducing no evidence, asked numerous instructions to the jury, among which were the following:

That section 137 of chapter 75 of the Revised Laws of Massachusetts was in derogation of the rights secured to the defendant by the Preamble to the Constitution of the United

States, and tended to subvert and defeat the purposes of the Constitution as declared in its Preamble;

That the section referred to was in derogation of the rights secured to the defendant by the Fourteenth Amendment of the Constitution of the United States, and especially of the clauses of that amendment providing that no State shall make or enforce any law abridging the privileges or immunities of citizens of the United States, nor deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws; and

That said section was opposed to the spirit of the Constitution.

Each of the defendant's prayers for instructions was rejected, and he duly excepted. The defendant requested the court, but the court refused, to instruct the jury to return a verdict of not guilty. And the court instructed the jury in substance that if they believed the evidence introduced by the Commonwealth and were satisfied beyond a reasonable doubt that the defendant was guilty of the offense charged in the complaint, they would be warranted in finding a verdict of guilty. A verdict of guilty was thereupon returned.

The case was then continued for the opinion of the Supreme Judicial Court of Massachusetts. That court overruled all the defendant's exceptions, sustained the action of the trial court, and thereafter, pursuant to the verdict of the jury, he was sentenced by the court to pay a fine of five dollars. And the court ordered that he stand committed until the fine was paid.

*Mr. George Fred Williams*, with whom *Mr. James A. Halloran* was on the brief, for plaintiff in error:

The right of the State under police power to enforce vaccination upon its inhabitants has not yet been determined, or more than remotely considered by this court; references are made to it in *Lawton* v. *Steele*, 152. U. S. 133; *Hannibal &*

*St. J. R. R. Co.* v. *Husen,* 95 U. S. 465; *Am. School of Heal-ing* v. *McAnnulty,* 187 U. S. 94. The plaintiff in error knows of no other cases in which the subject of vaccination has been considered by this court. From a summary of vaccination laws and vaccination statutes in the United States it appears that thirty-four States of the Union have no compulsory vaccination law, as follows: Alabama, Arkansas, California, Colorado, Delaware, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia and Wisconsin.

Compulsory vaccination exists in eleven States, as follows: Connecticut, Georgia, Kentucky, Maryland (of children), Massachusetts, Mississippi, North Carolina, Pennsylvania (in second class cities), South Carolina, Virginia and Wyoming. In thirteen States exclusion of unvaccinated children from the public schools is provided, as follows: California, Georgia, Iowa, Maine, Massachusetts, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, South Dakota and Virginia.

Three-quarters of the States have not entered upon the policy of enforcing vaccination by legal penalty. Not one of the States undertakes forcible vaccination, while Utah and West Virginia expressly provide that no such compulsion shall be used.

Smallpox has ceased to be the scourge which it once was, and there is a growing tendency to resort to sanitation and isolation rather than vaccination. The States which make no provision for vaccination are not any more afflicted with smallpox than those which compel vaccination. Even New York, which imports the major part of the immigrants who annually enter this country, has not undertaken to force it upon the people. As to other countries, the Queen of Holland has recently recommended the repeal of the compulsory vac-

cination laws. There are no vaccination laws in New Zealand, and Switzerland has by plebiscite abolished all compulsory vaccination.

The English law, 61 & 62 Vict., ch. 49, provides only for the vaccination of children, under a penalty, and furnishes to the people a special vaccinator.

See ch. 299, Laws of Minnesota of 1903, abolishing vaccination, and veto in 1901 of Governor La Follette of vaccination law of Wisconsin. In 1904 there were riots in Brazil arising from attempts to enforce vaccination.

For decisions of state courts involving vaccination laws which have mainly been decided upon statutes relating to the exclusion of children from the public schools see *Bissell* v. *Davison*, 65 Connecticut, 183; *Abeel* v. *Clark*, 84 California, 226; *State* v. *Zimmerman*, 86 Minnesota, 353; *Osborn* v. *Russell*, 64 Kansas, 507; *Potts* v. *Breen*, 167 Illinois, 67; *Duffield* v. *Williamsport School District*, 162 Pa. St. 476; *State* v. *Burdge*, 95 Wisconsin, 390; *Re Rebenack*, 62 Mo. App. 8; *Blue* v. *Beach*, 155 Indiana, 121. The only cases which have considered general compulsory vaccination laws are *State* v. *Hay*, 126 N. Car. 999; *Morris* v. *Columbus*, 102 Georgia, 792; *Re William H. Smith*, 146 N. Y. 68.

None of these cases are as extreme as the decision in the case at bar and the laws providing that unvaccinated children shall not attend the public schools are widely variant from laws compelling the vaccination of adult citizens.

As to admitted functions of the police power, see 4 Blackstone, 162; Cooley's Const. Lim. 704; *Han. & St. Jo. R. R. Co.* v. *Husen*, 95 U. S. 465, 470; but the power is for the security of liberty and not for oppression. *Barbier* v. *Connelly*, 113 U. S. 27; *Lawton* v. *Steele*, 152 U. S. 133.

A compulsory vaccination law is unreasonable, arbitrary and oppressive; it is only effective in the protection of lawbreakers; the legal penalty is illogical and unjust. See under English Act, 30 & 31 Vict., ch. 84, extent of penalties. *Regina*

v. *Justice*, L. R. 17 Q. B. D. 191; *Dutton* v. *Atkinson*, L. R. 6 Q. B. 373; *Pitcher* v. *Stafford*, 4 Vest. & S. 775; *Allen* v. *Worthy*, L. R. 5. Q. B. 163; *Tebb* v. *Jones*, 37 L. T. (N. S.) 576. The law is not of general application as children are exempted. Compulsion to introduce disease into a healthy system is a violation of liberty. The right to preserve life is the most sacred right of man, *Slaughter House Cases*, 16 Wall. 36, and is specially provided for in the Preamble of the Federal Constitution. If injured the person vaccinated is damaged without compensation. *Miller* v. *Horton*, 152 Massachusetts, 546. The law is not within any cognizable principle of criminal law. 1 Bishop, §§ 204, 230, 490, 513; *Commonwealth* v. *Thompson*, 6 Massachusetts, 134. The exemptions are unconstitutional. Minors are exempt while adults are penalized. The classification is not a reasonable one. *M., K. & T. Ry. Co.* v. *May*, 194 U. S. 267; *Gulf, Colo. & S. F.* v. *Ellis*, 165 U. S. 150.

Plaintiff in error offered to show that he had suffered seriously from previous vaccination, thus indicating that his system was sensitive to the poison of vaccination virus. The like illness of his son indicated that a hereditary condition existed which would cause the system to rebel against the introduction of the vaccine matter. If the plaintiff in error had offered the opinion of a physician that vaccination might even be deadly in its effects upon the plaintiff, the law recognized no such defense, and the evidence must have been excluded. The law itself testifies to its own oppressive and unreasonable character. It is not due process of law, when such defense is excluded. It is not equal protection of the laws, when such defense is open to parents for the protection of children and is not open to parents themselves. The right is of such an important and fundamental character as to deprive plaintiff of his liberty without due process of law. *West* v. *Louisiana*, 194 U. S. 258, 262.

The Board of Health is entrusted with arbitrary powers, and determines the necessity for, and methods of, vaccination

and plaintiff's rights in regard thereto without a hearing, thus depriving him of his liberty without due process of law. *Chi., M. & St. P. v. Minnesota*, 134 U. S. 418; *Hagan v. Reclamation Dist.*, 111 U. S. 701.

The law is not justified by necessity. *Miller v. Horton*, 152 Massachusetts, 546; *Am. School of Healing v. McAnnulty*, 187 U. S. 94.

Plaintiff in error was entitled to show the facts as they existed about vaccination and its effects.

*Mr. Frederick H. Nash*, with whom *Mr. Herbert Parker*, Attorney General of the State of Massachusetts, was on the brief, for defendant in error:

It is no argument that the conviction was repugnant to the spirit or to the Preamble of the Constitution. An act of the legislature of a State and regular proceedings under it are to be overthrown only by virtue of some specific prohibition in the paramount law. *Forsythe v. City of Hammond*, 68 Fed. Rep. 774; *Walker v. Cincinnati*, 21 Ohio St. 14, 41; *State v. Staten*, 6 Coldwell, 233, 252; *State v. Gerhardt*, 145 Indiana, 439, 450; *State v. Smith*, 44 Ohio St. 348, 374; *People v. Fisher*, 24 Wend 214, 219; *Redell v. Moores*, 63 Nebraska, 219, overruling *State v. Moores*, 55 Nebraska, 480. The Fifth Amendment does not apply to action by a State. *Barron v. Baltimore*, 7 Pet. 243, 247; *Eilenbecker v. Plymouth Co.*, 134 U. S. 31; *McElvaine v. Brush*, 142 U. S. 155, 158; *Brown v. New Jersey*, 175 U. S. 172; *Capital City Dairy Co. v. Ohio*, 183 U. S. 238; *Lloyd v. Dollison*, 194 U. S. 445.

It is now too late to argue that the provisions of the Fifth Amendment, securing the fundamental rights of the individual as against the exercise of Federal power, are by virtue of the Fourteenth Amendment to be regarded as privileges and immunities of a citizen of the United States. *Slaughter House Cases*, 16 Wall. 36; *Maxwell v. Dow*, 176 U. S. 581.

The privileges and immunities of the plaintiff in error except where he comes in contact with the machinery of the

Federal Government, are those which his own State gives him. In his relations with his State he takes no benefit from the Fifth Amendment or from the Preamble of the United States Constitution.

In its unquestioned power to preserve and protect the public health, it is for the legislature of each State to determine whether vaccination is effective in preventing the spread of smallpox or not, and deciding in the affirmative to require doubting individuals to yield for the welfare of the community. *In re Smith,* 146 N. Y. 68, 77; *Powell* v. *Pennsylvania,* 127 U. S. 678, 683.

The statute in the present case was enacted as a health measure, and has a real and substantial relation to that object.

Compare, by contrast, the statute forbidding the manufacture of cigars in tenement-houses, *In re Jacobs,* 98 N. Y. 98, the statute forbidding people to give away articles in connection with a sale of food, *People* v. *Gillson,* 109 N. Y. 389, and the statute forbidding bakers' employés to work more than ten hours a day, *People* v. *Lochner,* 177 N. Y. 145. Dissenting opinion.

Only in such cases of legislative dissimulation is it held that a law, apparently looking to the protection of the public health and working without undue classification, is a violation of the Fourteenth Amendment. *Mugler* v. *Kansas,* 123 U. S. 623; *Sentell* v. *New Orleans &c. Ry. Co.,* 166 U. S. 698, 704, 705; *Hawker* v. *New York,* 170 U. S. 189, 192; *Holden* v. *Hardy,* 169 U. S. 366.

In *Lawton* v. *Steele,* 152 U. S. 133, 136, it is said, by way of illustration, that compulsory vaccination is a proper exercise of the police power, see also *Morris* v. *City of Columbus,* 102 Georgia, 792, and *State* v. *Hay,* 126 N. Car. 999.

The courts may not listen to conflicting expert testimony as to the efficacy or hurtfulness of vaccination in general. The legislature is the only body which has power to determine whether the anti-vaccinationists or the majority of the medical profession are in the right.

That the legislature has large discretion to determine what personal sacrifice the public health, morals and safety require from individuals is elementary. Cases cited *supra*, and *Booth* v. *Illinois*, 184 U. S. 425; *Austin* v. *Tennessee*, 179 U. S. 343; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659.

The legislature of Massachusetts has power to require the vaccination of its inhabitants and fix appropriate penalties for refusal. As to the form of the legislation and its application to the plaintiff in error, the exception of minors and wards from the provisions of the statute, rests upon a reasonable basis of classification and denies to nobody the equal protection of the laws. The advantage of uniform and general laws is best attained by vesting discretionary power in local administrative bodies. *Wilson* v. *Eureka City*, 173 U. S. 32; *Health Department* v. *Rector of Trinity Church*, 145 N. Y. 32.

A perfectly equal law may easily be the most unjust. A statute requiring the vaccination of all the inhabitants of a State at a specified time irrespective of the presence of smallpox and without regard to individual conditions of health, or a set of rules and regulations made by the legislature itself, which must necessarily be more or less inelastic, would be far less just than this statute which delegates discretion to local public officials. It is wise legislation which leaves the necessity for general vaccination and the decision as to the time for vaccination of each individual to the local boards of health. If they act in an arbitrary manner, depriving any individual of a right protected by the Fourteenth Amendment, their action in such individual case is void. Thus the law in general stands, but particular cases of oppression may be prevented. Compare *Yick Wo* v. *Hopkins*, 118 U. S. 356, and *Jew Ho* v. *Williamson*, 103 Fed. Rep. 10, with *Williams* v. *Mississippi*, 170 U. S. 213; *Ex parte Virginia*, 100 U. S. 339; *Carter* v. *Texas*, 177 U. S. 442; *Tarrence* v. *Florida*, 188 U. S. 519.

The order of the Board of Health is clearly within the authority of the statute. *Matthews* v. *Board of Education*, 127

Michigan, 530; *Potts* v. *Breen,* 167 Illinois, 67; *State* v. *Burdge,* 95 Wisconsin, 390; *Lawbaugh* v. *Board of Education,* 177 Illinois, 572; *In re Smith,* 146 N. Y. 68; *Wong Wai* v. *Williamson,* 103 Fed. Rep. 1; *Wilson* v. *Alabama &c. R. R. Co.,* 77 Mississippi, 714; *Hurst* v. *Warner,* 102 Michigan, 238, distinguished, as the rules were held to be broader than the statute. And see where regulations were sustained, *Field* v. *Robinson,* 198 Pa. St. 638; *State* v. *Board of Education,* 21 Utah, 401; *Blue* v. *Beach,* 155 Indiana, 121; *Bissell* v. *Davidson,* 65 Connecticut, 183; *Morris* v. *City of Columbus,* 102 Georgia, 792. In *State* v. *Hay,* 126 N. Car. 999, the court observed that if the jury had found that the defendant's health made it unsafe for him to be vaccinated that would be a sufficient excuse for his non-compliance, since to vaccinate him under such conditions would be an arbitrary and unreasonable enforcement of the statute. See also *Abeel* v. *Clark,* 84 California, 226; *State* v. *Bell,* 157 Indiana, 25; *State* v. *Zimmerman,* 86 Minnesota, 353; *Matter of Walters,* 84 Hun, 457.

The action taken by the Board of Health in the case of the plaintiff in error did not infringe his rights under the Federal Constitution. Arbitrary action by the Board of Health, "with evil mind," might result in a denial of due process of law. If they picked out one class of persons arbitrarily for immediate vaccination, while indefinitely postponing action toward all others, or if they otherwise abused their discretion their action might be in violation of the Fourteenth Amendment, cases cited *supra,* but there is no suggestion of arbitrary conduct. It is not even hinted that in the exercise of their discretion they failed to make proper discrimination as to temporary conditions. If there were special reasons why the plaintiff in error could not be vaccinated at the time required by the Board of Health, he should have made them a ground of his refusal; and, if the Board neglected to consider them, a defense to his prosecution. *Penn. R. R. Co.* v. *Jersey City,* 47 N. J. L. 286. The statute did not require the vaccination and revaccination of all the inhabitants, without discrimination,

but left the matter to the discretion of the local authorities. This was an unobjectionable method of legislation. *Field* v. *Clark*, 143 U. S. 649, 693, 694.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

We pass without extended discussion the suggestion that the particular section of the statute of Massachusetts now in question (§ 137, c. 75) is in derogation of rights secured by the Preamble of the Constitution of the United States. Although that Preamble indicates the general purposes for which the people ordained and established the Constitution, it has never been regarded as the source of any substantive power conferred on the Government of the United States or on any of its Departments. Such powers embrace only those expressly granted in the body of the Constitution and such as may be implied from those so granted. Although, therefore, one of the declared objects of the Constitution was to secure the blessings of liberty to all under the sovereign jurisdiction and authority of the United States, no power can be exerted to that end by the United States unless, apart from the Preamble, it be found in some express delegation of power or in some power to be properly implied therefrom. 1 Story's Const. § 462.

We also pass without discussion the suggestion that the above section of the statute is opposed to the spirit of the Constitution. Undoubtedly, as observed by Chief Justice Marshall, speaking for the court in *Sturges* v. *Crowninshield*, 4 Wheat. 122, 202, "the spirit of an instrument, especially of a constitution, is to be respected not less than its letter, yet the spirit is to be collected chiefly from its words." We have no need in this case to go beyond the plain, obvious meaning of the words in those provisions of the Constitution which, it is contended, must control our decision.

What, according to the judgment of the state court, is the

scope and effect of the statute?  What results were intended to be accomplished by it?  These questions must be answered.

The Supreme Judicial Court of Massachusetts said in the present case: "Let us consider the offer of evidence which was made by the defendant Jacobson.  The ninth of the propositions which he offered to prove, as to what vaccination consists of, is nothing more than a fact of common knowledge, upon which the statute is founded, and proof of it was unnecessary and immaterial.  The thirteenth and fourteenth involved matters depending upon his personal opinion, which could not be taken as correct, or given effect, merely because he made it a ground of refusal to comply with the requirement.  Moreover, his views could not affect the validity of the statute, nor entitle him to be excepted from its provisions. *Commonwealth* v. *Connelly,* 163 Massachusetts, 539; *Commonwealth* v. *Has,* 122 Massachusetts, 40; *Reynolds* v. *United States,* 98 U. S. 145; *Regina* v. *Downes,* 13 Cox C. C. 111.  The other eleven propositions all relate to alleged injurious or dangerous effects of vaccination.  The defendant 'offered to prove and show by competent evidence' these so-called facts.  Each of them, in its nature, is such that it cannot be stated as a truth, otherwise than as a matter of opinion.  The only 'competent evidence' that could be presented to the court to prove these propositions was the testimony of experts, giving their opinions.  It would not have been competent to introduce the medical history of individual cases.  Assuming that medical experts could have been found who would have testified in support of these propositions, and that it had become the duty of the judge, in accordance with the law as stated in *Commonwealth* v. *Anthes,* 5 Gray, 185, to instruct the jury as to whether or not the statute is constitutional, he would have been obliged to consider the evidence in connection with facts of common knowledge, which the court will always regard in passing upon the constitutionality of a statute.  He would have considered this testimony of experts in connection with the facts that for nearly a century most of the members of the medical profession

have regarded vaccination, repeated after intervals, as a preventive of smallpox; that while they have recognized the possibility of injury to an individual from carelessness in the performance of it, or even in a conceivable case without carelessness, they generally have considered the risk of such an injury too small to be seriously weighed as against the benefits coming from the discreet and proper use of the preventive; and that not only the medical profession and the people generally have for a long time entertained these opinions, but legislatures and courts have acted upon them with general unanimity. If the defendant had been permitted to introduce such expert testimony as he had in support of these several propositions, it could not have changed the result. It would not have justified the court in holding that the legislature had transcended its power in enacting this statute on their judgment of what the welfare of the people demands." *Commonwealth* v. *Jacobson*, 183 Massachusetts, 242.

While the mere rejection of defendant's offers of proof does not strictly present a Federal question, we may properly regard the exclusion of evidence upon the ground of its incompetency or immateriality under the statute as showing what, in the opinion of the state court, is the scope and meaning of the statute. Taking the above observations of the state court as indicating the scope of the statute—and such is our duty, *Leffingwell* v. *Warren*, 2 Black, 599, 603, *Morley* v. *Lake Shore Railway Co.*, 146 U. S. 162, 167, *Tullis* v. *L. E. & W. R. R. Co.*, 175 U. S. 348, *W. W. Cargill Co.* v. *Minnesota*, 180 U. S. 452, 466—we assume for the purposes of the present inquiry that its provisions require, at least as a general rule, that adults not under guardianship and remaining within the limits of the city of Cambridge must submit to the regulation adopted by the Board of Health. Is the statute, so construed, therefore, inconsistent with the liberty which the Constitution of the United States secures to every person against deprivation by the State?

The authority of the State to enact this statute is to be

referred to what is commonly called the police power—a power which the State did not surrender when becoming a member of the Union under the Constitution. Although this court has refrained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a State to enact quarantine laws and "health laws of every description;" indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other States. According to settled principles the police power of a State must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety. *Gibbons* v. *Ogden,* 9 Wheat. 1, 203; *Railroad Company* v. *Husen,* 95 U. S. 465, 470; *Beer Company* v. *Massachusetts,* 97 U. S. 25; *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650, 661; *Lawton* v. *Steele,* 152 U. S. 133. It is equally true that the State may invest local bodies called into existence for purposes of local administration with authority in some appropriate way to safeguard the public health and the public safety. The mode or manner in which those results are to be accomplished is within the discretion of the State, subject, of course, so far as Federal power is concerned, only to the condition that no rule prescribed by a State, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation, shall contravene the Constitution of the United States or infringe any right granted or secured by that instrument. A local enactment or regulation, even if based on the acknowledged police powers of a State, must always yield in case of conflict with the exercise by the General Government of any power it possesses under the Constitution, or with any right which that instrument gives or secures. *Gibbons* v. *Ogden,* 9 Wheat. 1, 210; *Sinnot* v. *Davenport,* 22 How. 227, 243; *Missouri, Kansas & Texas Ry. Co.* v. *Haber,* 169 U. S. 613, 626.

We come, then, to inquire whether any right given, or secured by the Constitution, is invaded by the statute as in-

terpreted by the state court. The defendant insists that his liberty is invaded when the State subjects him to fine or imprisonment for neglecting or refusing to submit to vaccination; that a compulsory vaccination law is unreasonable, arbitrary and oppressive, and, therefore, hostile to the inherent right of every freeman to care for his own body and health in such way as to him seems best; and that the execution of such a law against one who objects to vaccination, no matter for what reason, is nothing short of an assault upon his person. But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that "persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the State; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be made, so far as natural persons are concerned." *Railroad Co.* v. *Husen,* 95 U. S. 465, 471; *Missouri, Kansas & Texas Ry. Co.* v. *Haber,* 169 U. S. 613, 628, 629; *Thorpe* v. *Rutland & Burlington R. R.,* 27 Vermont, 140, 148. In *Crowley* v *Christensen,* 137 U. S. 86, 89, we said: "The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community. Even liberty

itself, the greatest of all rights, is not unrestricted license to act according to one's own will.  It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others.  It is then liberty regulated by law."  In the constitution of Massachusetts adopted in 1780 it was laid down as a fundamental principle of the social compact that the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for "the common good," and that government is instituted "for the common good, for the protection, safety, prosperity and happiness of the people, and not for the profit, honor or private interests of any one man, family or class of men."  The good and welfare of the Commonwealth, of which the legislature is primarily the judge, is the basis on which the police power rests in Massachusetts. *Commonwealth* v. *Alger*, 7 Cush. 53, 84.

Applying these principles to the present case, it is to be observed that the legislature of Massachusetts required the inhabitants of a city or town to be vaccinated only when, in the opinion of the Board of Health, that was necessary for the public health or the public safety.  The authority to determine for all what ought to be done in such an emergency must have been lodged somewhere or in some body; and surely it was appropriate for the legislature to refer that question, in the first instance, to a Board of Health, composed of persons residing in the locality affected and appointed, presumably, because of their fitness to determine such questions.  To invest such a body with authority over such matters was not an unusual nor an unreasonable or arbitrary requirement.  Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members.  It is to be observed that when the regulation in question was adopted, smallpox, according to the recitals in the regulation adopted by the Board of Health, was prevalent to some extent in the city of Cambridge and the disease was increasing.  If such was

the situation—and nothing is asserted or appears in the record to the contrary—if we are to attach any value whatever to the knowledge which, it is safe to affirm, is common to all civilized peoples touching smallpox and the methods most usually employed to eradicate that disease, it cannot be adjudged that the present regulation of the Board of Health was not necessary in order to protect the public health and secure the public safety. Smallpox being prevalent and increasing at Cambridge, the court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the State, to protect the people at large, was arbitrary and not justified by the necessities of the case. We say necessities of the case, because it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all, might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons. *Wisconsin &c. R. R. Co.* v. *Jacobson,* 179 U. S. 287, 301; 1 Dillon Mun. Corp., 4th ed., §§ 319 *to* 325, and authorities in notes; Freund's Police Power, § 63 *et seq.* In *Railroad Company* v. *Husen,* 95 U. S. 465, 471–473, this court recognized the right of a State to pass sanitary laws, laws for the protection of life, liberty, health or property within its limits, laws to prevent persons and animals suffering under contagious or infectious diseases, or convicts, from coming within its borders. But as the laws there involved went beyond the necessity of the case and under the guise of exerting a police power invaded the domain of Federal authority and violated rights secured by the Constitution, this court deemed it to be its duty to hold such laws invalid. If the mode adopted by the Commonwealth of Massachusetts for the protection of its local communities against smallpox proved to be distressing, inconvenient or objectionable to some—if nothing more could be reasonably

affirmed of the statute in question—the answer is that it was the duty of the constituted authorities primarily to keep in view the welfare, comfort and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few. There is, of course, a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will. But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand. An American citizen, arriving at an American port on a vessel in which, during the voyage, there had been cases of yellow fever or Asiatic cholera, although apparently free from disease himself, may yet, in some circumstances, be held in quarantine against his will on board of such vessel or in a quarantine station, until it be ascertained by inspection, conducted with due diligence, that the danger of the spread of the disease among the community at large has disappeared. The liberty secured by the Fourteenth Amendment, this court has said, consists, in part, in the right of a person "to live and work where he will," *Allgeyer* v. *Louisiana,* 165 U. S. 578; and yet he may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense. It is not, therefore, true that the power of the public to guard itself against imminent danger depends in every case involving the control of one's body upon his willingness to submit to reasonable regulations established by the constituted authorities, under the

sanction of the State, for the purpose of protecting the public collectively against such danger.

It is said, however, that the statute, as interpreted by the state court, although making an exception in favor of children certified by a registered physician to be unfit subjects for vaccination, makes no exception in the case of adults in like condition. But this cannot be deemed a denial of the equal protection of the laws to adults; for the statute is applicable equally to all in like condition and there are obviously reasons why regulations may be appropriate for adults which could not be safely applied to persons of tender years.

Looking at the propositions embodied in the defendant's rejected offers of proof it is clear that they are more formidable by their number than by their inherent value. Those offers in the main seem to have had no purpose except to state the general theory of those of the medical profession who attach little or no value to vaccination as a means of preventing the spread of smallpox or who think that vaccination causes other diseases of the body. What everybody knows the court must know, and therefore the state court judicially knew, as this court knows, that an opposite theory accords with the common belief and is maintained by high medical authority. We must assume that when the statute in question was passed, the legislature of Massachusetts was not unaware of these opposing theories, and was compelled, of necessity, to choose between them. It was not compelled to commit a matter involving the public health and safety to the final decision of a court or jury. It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease. That was for the legislative department to determine in the light of all the information it had or could obtain. It could not properly abdicate its function to guard the public health and safety. The state legislature proceeded upon the theory which recognized vaccination as at least an effective if not the best known way in which to meet and suppress the

evils of a smallpox epidemic that imperilled an entire population. Upon what sound principles as to the relations existing between the different departments of government can the court review this action of the legislature? If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Mugler v. Kansas*, 123 U. S. 623, 661; *Minnesota v. Barber*, 136 U. S. 313, 320; *Atkin v. Kansas*, 191 U. S. 207, 223.

Whatever may be thought of the expediency of this statute, it cannot be affirmed to be, beyond question, in palpable conflict with the Constitution. Nor, in view of the methods employed to stamp out the disease of smallpox, can anyone confidently assert that the means prescribed by the State to that end has no real or substantial relation to the protection of the public health and the public safety. Such an assertion would not be consistent with the experience of this and other countries whose authorities have dealt with the disease of smallpox.[1] And the principle of vaccination as a means to

[1] "State-supported facilities for vaccination began in England in 1808 with the National Vaccine Establishment. In 1840 vaccination fees were made payable out of the rates. The first compulsory act was passed in 1853, the guardians of the poor being entrusted with the carrying out of the law; in 1854 the public vaccinations under one year of age were 408,825 as against an average of 180,960 for several years before. In 1867 a new Act was passed, rather to remove some technical difficulties than to enlarge the scope of the former Act; and in 1871 the Act was passed which compelled the boards of guardians to appoint vaccination officers. The guardians also appoint a public vaccinator, who must be duly qualified to practice medicine, and whose duty it is to vaccinate (for a fee of one shilling and sixpence) any child resident within his district brought to him for that purpose, to examine the same a week after, to give a certificate, and to certify to the vaccination officer the fact of vaccination or of insusceptibility. . . . .

prevent the spread of smallpox has been enforced in many
States by statutes making the vaccination of children a con-
dition of their right to enter or remain in public schools. *Blue
v. Beach*, 155 Indiana, 121; *Morris* v. *City of Columbus*, 102

Vaccination was made compulsory in Bavaria in 1807, and subsequently in
the following countries: Denmark (1810), Sweden (1814), Würtemburg,
Hesse, and other German states (1818), Prussia (1835), Roumania (1874),
Hungary (1876), and Servia (1881). It is compulsory by cantonal law in
ten out of the twenty-two Swiss cantons; an attempt to pass a federal com-
pulsory law was defeated by a plebiscite in 1881. In the following countries
there is no compulsory law, but Government facilities and compulsion on
various classes more or less directly under Government control, such as
soldiers, state employés, apprentices, school pupils, etc.: France, Italy,
Spain, Portugal, Belgium, Norway, Austria, Turkey. . . . Vaccination
has been compulsory in South Australia since 1872, in Victoria since 1874,
and in Western Australia since 1878. In Tasmania a compulsory Act was
passed in 1882. In New South Wales there is no compulsion, but free facil-
ities for vaccination. Compulsion was adopted at Calcutta in 1880, and
since then at eighty other towns of Bengal, at Madras in 1884, and at
Bombay and elsewhere in the presidency a few years earlier. Revaccina-
tion was made compulsory in Denmark in 1871, and in Roumania in
1874; in Holland it was enacted for all school pupils in 1872. The vari-
ous laws and administrative orders which had been for many years in force
as to vaccination and revaccination in the several German states were con-
solidated in an imperial statute of 1874." 24 *Encyclopædia Britannica*
(1894), *Vaccination*.

"In 1857 the British Parliament received answers from 552 physicians
to questions which were asked them in reference to the utility of vaccina-
tion, and only two of these spoke against it. Nothing proves this utility
more clearly than the statistics obtained. Especially instructive are those
which Flinzer compiled respecting the epidemic in Chemitz which prevailed
in 1870–71. At this time in the town there were 64,255 inhabitants, of
whom 53,891, or 83.87 per cent., were vaccinated, 5,712, or 8.89 per cent.
were unvaccinated, and 4,652, or 7.24 per cent., had had the smallpox
before. Of those vaccinated 953, or 1.77 per cent., became affected with
smallpox, and of the uninocculated 2,643, or 46.3 per cent., had the disease.
In the vaccinated the mortality from the disease was 0.73 per cent., and in
the unprotected it was 9.16 per cent. In general, the danger of infection
is six times as great, and the mortality 68 times as great, in the unvaccinated
as in the vaccinated. Statistics derived from the civil population are in
general not so instructive as those derived from armies, where vaccination
is usually more carefully performed and where statistics can be more ac-
curately collected. During the Franco-German war (1870–71) there was
in France a widespread epidemic of smallpox, but the German army lost

Georgia, 792; *State* v. *Hay*, 126 N. Car. 999; *Abeel* v. *Clark*, 84 California, 226; *Bissell* v. *Davidson*, 65 Connecticut, 183; *Hazen* v. *Strong*, 2 Vermont, 427; *Duffield* v. *Williamsport School District,* 162 Pa. St. 476.

---

during the campaign only 450 cases, or 58 men to the 100,000; in the French army, however, where vaccination was not carefully carried out, the number of deaths from smallpox was 23,400." 8 *Johnson's Universal Cyclopædia* (1897), *Vaccination.*

"The degree of protection afforded by vaccination thus became a question of great interest. Its extreme value was easily demonstrated by statistical researches. In England, in the last half of the eighteenth century, out of every 1,000 deaths, 96 occurred from smallpox; in the first half of the present century, out of every 1,000 deaths, but 35 were caused by that disease. The amount of mortality in a country by smallpox seems to bear a fixed relation to the extent to which vaccination is carried out. In all England and Wales, for some years previous to 1853, the proportional mortality by smallpox was 21.9 to 1,000 deaths from causes; in London it was but 16 to 1,000; in Ireland, where vaccination was much less general, it was 49 to 1,000, while in Connaught it was 60 to 1,000. On the other hand, in a number of European countries where vaccination was more or less compulsory, the proportionate number of deaths from smallpox about the same time varied from 2 per 1,000 of causes in Bohemia, Lombardy, Venice, and Sweden, to 8.33 per 1,000 in Saxony. Although in many instances persons who had been vaccinated were attacked with smallpox in a more or less modified form, it was noticed that the persons so attacked had been commonly vaccinated many years previously." 16 *American Cyclopedia, Vaccination,* (1883).

" 'Dr. Buchanan, the medical officer of the London Government Board, reported [1881] as the result of statistics that the smallpox death rate among adult persons vaccinated was 90 to a million; whereas among those unvaccinated it was 3,350 to a million; whereas among vaccinated children under 5 years of age, 42½ per million; whereas among unvaccinated children of the same age it was 5,950 per million.' *Hardway's Essentials of Vaccination* (1882). The same author reports that among other conclusions reached by the Académie de Médicine of France, was one that 'without vaccination, hygienic measures (isolation, disinfection, etc.) are of themselves insufficient for preservation from smallpox.' " *Ib.*

"The Belgian Academy of Medicine appointed a committee to make an exhaustive examination of the whole subject, and among the conclusions reported by them were: 1. 'Without vaccination, hygienic measures and means, whether public or private, are powerless in preserving mankind from smallpox. . . . 3. Vaccination is always an inoffensive operation when

The latest case upon the subject of which we are aware is *Viemeister* v. *White, President &c.*, decided very recently by the Court of Appeals of New York, and the opinion in which has not yet appeared in the regular reports. That case involved the validity of a statute excluding from the public schools all children who had not been vaccinated. One contention was that the statute and the regulation adopted in exercise of its provisions was inconsistent with the rights, privileges and liberties of the citizen. The contention was overruled, the court saying, among other things: "Smallpox is known of all to be a dangerous and contagious disease. If vaccination strongly tends to prevent the transmission or spread of this disease, it logically follows that children may be refused admission to the public schools until they have been vaccinated. The appellant claims that vaccination does not tend to prevent smallpox, but tends to bring about other diseases, and that it does much harm, with no good.

" It must be conceded that some laymen, both learned and unlearned, and some physicians of great skill and repute, do not believe that vaccination is a preventive of smallpox. The common belief, however, is that it has a decided tendency to prevent the spread of this fearful disease and to render it less dangerous to those who contract it. While not accepted by all, it is accepted by the mass of the people, as well as by most members of the medical profession. It has been general in our State and in most civilized nations for generations. It is

---

practiced with proper care on healthy subjects. . . . 4. It is highly desirable, in the interests of the health and lives of our countrymen, that vaccination should be rendered compulsory.' " *Edwards' Vaccination* (1882).

The English Royal Commission, appointed with Lord Herschell, the Lord Chancellor of England, at its head, to inquire, among other things, as to the effect of vaccination in reducing the prevalence of, and mortality from, smallpox, reported, after several years of investigation: "We think that it diminishes the liability to be attacked by the disease; that it modifies the character of the disease and renders it less fatal, of a milder and less severe type; that the protection it affords against attacks of the disease is greatest during the years immediately succeeding the operation of vaccination."

generally accepted in theory and generally applied in practice, both by the voluntary action of the people and in obedience to the command of law.   Nearly every State of the Union has statutes to encourage, or directly or indirectly to require, vaccination, and this is true of most nations of Europe.  .   .   .

." A common belief, like common knowledge, does not require evidence to establish its existence, but may be acted upon without proof by the legislature and the courts.  .   .   .

" The fact that the belief is not universal is not controlling, for there is scarcely any belief that is accepted by everyone. The possibility that the belief may be wrong, and that science may yet show it to be wrong, is not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases.  In a free country, where the government is by the people, through their chosen representatives, practical legislation admits of no other standard of action; for what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not.  Any other basis would conflict with the spirit of the Constitution, and would sanction measures opposed to a republican form of government.   While we do not decide and cannot decide that vaccination is a preventive of smallpox, we take judicial notice of the fact that this is the common belief of the people of the State, and with this fact as a foundation we hold that the statute in question is a health law, enacted in a reasonable and proper exercise of the police power."·   72 N. E. Rep. 97.  ·

Since then vaccination, as a means of protecting a community against smallpox, finds strong support in the experience of this and other countries, no court, much less a jury, is justified in disregarding the action of the legislature simply because in its or their opinion that particular method was— perhaps or possibly—not the best either for children or adults.

Did the offers of proof made by the defendant present a case which entitled him, while remaining in Cambridge, to

claim exemption from the operation of the statute and of the regulation adopted by the Board of Health? We have already said that his rejected offers, in the main, only set forth the theory of those who had no faith in vaccination as a means of preventing the spread of smallpox, or who thought that vaccination, without benefiting the public, put in peril the health of the person vaccinated. But there were some offers which it is contended embodied distinct facts that might properly have been considered. Let us see how this is.

The defendant offered to prove that vaccination "quite often" caused serious and permanent injury to the health of the person vaccinated; that the operation "occasionally" resulted in death; that it was "impossible" to tell "in any particular case" what the results of vaccination would be or whether it would injure the health or result in death; that "quite often" one's blood is in a certain condition of impurity when it is not prudent or safe to vaccinate him; that there is no practical test by which to determine "with any degree of certainty" whether one's blood is in such condition of impurity as to render vaccination necessarily unsafe or dangerous; that vaccine matter is "quite often" impure and dangerous to be used, but whether impure or not cannot be ascertained by any known practical test; that the defendant refused to submit to vaccination for the reason that he had, "when a child," been caused great and extreme suffering for a long period by a disease produced by vaccination; and that he had witnessed a similar result of vaccination not only in the case of his son, but in the cases of others.

These offers, in effect, invited the court and jury to go over the whole ground gone over by the legislature when it enacted the statute in question. The legislature assumed that some children, by reason of their condition at the time, might not be fit subjects of vaccination; and it is suggested—and we will not say without reason—that such is the case with some adults. But the defendant did not offer to prove that, by reason of his then condition, he was in fact not a fit subject of vaccination

at the time he was informed of the requirement of the regulation adopted by the Board of Health. It is entirely consistent with his offer of proof that, after reaching full age he had become, so far as medical skill could discover, and when informed of the regulation of the Board of Health was, a fit subject of vaccination, and that the vaccine matter to be used in his case was such as any medical practitioner of good standing would regard as proper to be used. The matured opinions of medical men everywhere, and the experience of mankind, as all must know, negative the suggestion that it is not possible in any case to determine whether vaccination is safe. Was defendant exempted from the operation of the statute simply because of his dread of the same evil results experienced by him when a child and had observed in the cases of his son and other children? Could he reasonably claim such an exemption because "quite often" or "occasionally" injury had resulted from vaccination, or because it was impossible, in the opinion of some, by any practical test, to determine with absolute certainty whether a particular person could be safely vaccinated?

It seems to the court that an affirmative answer to these questions would practically strip the legislative department of its function to care for the public health and the public safety when endangered by epidemics of disease. Such an answer would mean that compulsory vaccination could not, in any conceivable case, be legally enforced in a community, even at the command of the legislature, however widespread the epidemic of smallpox, and however deep and universal was the belief of the community and of its medical advisers, that a system of general vaccination was vital to the safety of all.

We are not prepared to hold that a minority, residing or remaining in any city or town where smallpox is prevalent, and enjoying the general protection afforded by an organized local government, may thus defy the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the State. If such be the privilege of a minority

then a. like privilege would belong to each individual of the community, and the spectacle would be presented of the welfare and safety of. an entire population being subordinated to the notions of a single individual who chooses to remain a part of that population. We are unwilling to hold it to be. an element in the liberty secured by the Constitution of the United States that one person, or a minority of persons, residing in any community and enjoying the benefits of its local government, should have the power thus to dominate the majority when supported in their action by the authority of the State. While this court should guard with firmness every right appertaining to life, liberty or property as secured to the individual by the Supreme Law of the Land, it is of the last importance that it should not invade the domain of local authority except when it is plainly necessary to do so in order to enforce that law. The safety and the health of the people of Massachusetts are, in the first instance, for that Commonwealth to guard and protect. They are matters that do not ordinarily concern the National Government. So far as they can be reached by any government, they depend, primarily, upon such action as the State in its wisdom may take; and we do not perceive that this legislation has invaded any right secured by the Federal Constitution.

Before closing this opinion we deem it appropriate, in order to prevent misapprehension as to our views, to observe— perhaps to repeat a thought already sufficiently expressed, namely—that the police power of a State, whether exercised by the legislature, or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression. Extreme cases can be readily suggested. Ordinarily such cases are not safe guides in the administration of the law. It is easy; for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health

or body, would be cruel and inhuman in the last degree. We are not to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judiciary would not be competent to interfere and protect the health and life of the individual concerned. "All laws," this court has said, "should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression or absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of that character. The reason of the law in such cases should prevail over its letter." *United States* v. *Kirby*, 7 Wall. 482; *Lau Ow Bew* v. *United States*, 144 U. S. 47, 58. Until otherwise informed by the highest court of Massachusetts we are not inclined to hold that the statute establishes the absolute rule that an adult must be vaccinated if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination or that vaccination, by reason of his then condition, would seriously impair his health or probably cause his death. No such case is here presented. It is the case of an adult who, for aught that appears, was himself in perfect health and a fit subject of vaccination, and yet, while remaining in the community, refused to obey the statute and the regulation adopted in execution of its provisions for the protection of the public health and the public safety, confessedly endangered by the presence of a dangerous disease.

We now decide only that the statute covers the present case, and that nothing clearly appears that would justify this court in holding it to be unconstitutional and inoperative in its application to the plaintiff in error.

The judgment of the court below must be affirmed.

*It is so ordered.*

MR. JUSTICE BREWER and MR. JUSTICE PECKHAM dissent.