

# The Attorney General of Texas

December 19, 1979

MARK WHITE
Attorney General

Supreme Court Building
P.O. Box 12548
Austin, TX. 78711
512/475-2501

701 Commerce, Suite 200
Dallas, TX. 75202
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905
915/533-3484

723 Main. Suite 610
Houston, TX. 77002
713/228-0701

806 Broadway, Suite 312
Lubbock, TX. 79401
806/747-5238

4313 N. Tenth, Suite F
McAllen, TX. 78501
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Honorable Ron Jackson
Texas Youth Council
8900 Shoal Creek Boulevard
Austin, Texas 78766

Opinion No. MW-105

Re: Whether the Texas Youth Council may provide medical services to its wards without parental consent.

Dear Mr. Jackson:

You have asked several questions concerning the authority of the Texas Youth Council (hereinafter TYC) to provide medical services to its wards under three different but overlapping sets of circumstances:

(1) When parents have not responded to a request for consent;

(2) When parents have expressly refused their consent;

(3) When the patient has refused consent.

Title 2 of the Texas Family Code deals with the parent-child relationship, and Title 3 establishes procedures for dealing with delinquents. Like Title 2, Title 3 contemplates the removal of children from their home by the power of the state. <u>Compare</u> Chapters 15 and 17 of Title 2, with Chapters 51, 52, 53 and 54 of Title 3. Unlike Title 2, Title 3 does not specifically indicate the manner in which the substantive rights of a parent are altered by a proceeding in which the state takes custody of the child. <u>Compare</u> Chapters 12 and 14 of Title 2 with section 54.04 of Title 3. Yet the parent-child relationship is necessarily altered by any disposition under section 54.04.

Section 12.04 states:

> <u>Except as otherwise provided by judicial order</u> or by an affidavit of relinquishment of parental rights executed under Section 15.03 of this code, <u>the parent of a child has the following rights, privileges, duties, and powers:</u>

(1)    the right to have physical possession of the child and to establish its legal domicile;
(2)    the duty of care, control, protection, moral and religious training, and reasonable discipline of the child;
(3)    the duty to support the child, including providing the child with clothing, food, shelter, medical care, and education;
(4)    the duty to manage the estate of the child, except when a guardian of the estate has been appointed;
(5)    the right to the services and earnings of the child;
(6)    the power to consent to marriage, to enlistment in the armed forces of the United States, and to medical, psychiatric, and surgical treatment;
(7)    the power to represent the child in legal action and to make other decisions of substantial legal significance concerning the child;
(8)    the power to receive and give receipt for payments for the support of the child and to hold or disburse any funds for the benefit of the child;
(9)    the right to inherit from and through the child; and
(10)   any other right, privilege, duty, or power existing between a parent and child by virtue of law.

(Emphasis added). Under section 54.04(d) of the Family Code, a child may be placed

(1)    ... on probation on such reasonable and lawful terms as the court may determine for a period not to exceed one year, subject to extensions not to exceed one year each:

(A)    in his own home or in the custody of a relative or other fit person;
(B)    in a suitable foster home; or
(C)    in a suitable public or private institution or agency except the Texas Youth Council; or

(2)    if the court or jury found at the conclusion of the adjudication hearing that the child engaged in delinquent conduct, the court may commit the child to the Texas Youth Council.

A simple reading of this section shows that, under any possible disposition, parental rights as defined in section 12.04 are altered. Each possible disposition alters the rights in different ways. Any disposition provides at the least that the court assumes the duty of care, control, protection, and reasonable discipline of the child. Placing the child with a relative temporarily extinguishes the parent's right to have physical possession of the child. The placing of a child with TYC is obviously the disposition which most thoroughly alters the rights, privileges, duties, and powers of a parent. However, no mention of the different alterations of the parental powers and duties is made in the Texas Family Code.

One reading of the law would give TYC very broad powers as a result of a court's commitment of a child to its care. Section 51.02(3) of the Family Code defines "guardian" as

> the person who, under court order, is the guardian of the person of the child or the public or private agency with whom the child has been placed by a court.

This plainly makes TYC the guardian of a child committed to it under section 54.04 of the Family Code. Title 2 of the Family Code does not define "guardian" as a term of art but does define the term "managing conservator," in section 14.02. In the context of the Probate Code, it has been squarely held that guardianship and managing conservatorship are the same. Guardianship of Henson, 551 S.W.2d 136 (Tex. Civ. App. -- Corpus Christi 1977, writ ref'd n.r.e.). However, the definition of managing conservator in the Family Code seems specially designed to deal with the problems raised in a divorce. This reading would give TYC far more power over its wards than we believe the legislature contemplated. We therefore rest our opinion on other grounds.

TYC originated with the Gatesville School for Boys in 1889. From that date until the present TYC and its predecessors have provided medical services of all sorts to the juveniles committed to its care with only the most general authorization. For instance, Acts 1913, 33rd Leg., 1st C.S., ch. 6, §§ 12, 13, at 7, provided:

> The superintendent shall divide the inmates into such classes and shall house, feed and train them in such manner as he deems best for the development and advancement of the child. All inmates shall be provided with shelter, wholesome food and suitable clothing, books, means of healthful recreation and other material necessary for their training, at the expense of the state, except as otherwise provided by law.

This statute was the sole authority for education, housing, medical care and other treatment of juveniles from its enactment until 1949. It is still on the books as V.T.C.S. article 5129. That medical care was authorized by this very general language, and that the legislature in fact was aware that such medical care was provided, is demonstrated by the reference to a "resident nurse" in Acts 1913, 1st C.S., 33rd Leg., ch. 6, § 15, at 7. The section was amended slightly and the words "school physician" were substituted for "resident nurse" in 1945. Acts 1945, 49th Leg., ch. 247, § 1, at 385.

In 1949, the state legislature transferred the control of the State Training Schools, including the Gatesville School for boys, from the Board of Control to a newly created State Youth Development Council, V.T.C.S. art. 5143c, and in 1957, to TYC. V.T.C.S. art. 5143d. In each case it was specifically provided that the new agency would succeed to all the powers and rights of its predecessor. Art. 5143c, § 8; art. 5143d, § 5(c).

The 1949 legislation concerning juveniles was an attempt by the legislature to organize and modernize the system of State Training Schools. The great bulk of article

5143c, the major 1949 statute, is devoted to laying out a blueprint for the organization of state administrative and judicial procedures dealing with juveniles. Several sections of the law also address the authority of the newly created state agency to deal with its wards. It seems clear from the fact that the original section which granted similar authority, article 5129, was not repealed that the provisions of article 5143c were meant merely to elucidate and not to limit the powers of the state agency.

The new sections addressed the issue in language somewhat more specific than the old, but still very general. For example, article 5143c, section 1 stated that the purpose of the act was to develop

> in all children the spiritual, mental, and physical resources necessary for complete citizenship responsibility and participation. . . .

Section 2 of the article provided, significantly for the purposes of interpretation,

> This Act shall be liberally construed to accomplish the purpose herein sought.

(Emphasis added). It was also provided, in section 19 of article 5143c that:

> As a means of correcting the socially harmful tendencies of a child committed to it, the Council may:
>
>     . . . .
>
> (b) Require such modes of life and conduct as seem best adapted to fit him for return to full liberty without danger to the public;
> (c) Provide such medical or psychiatric treatment as is necessary; . . .

Article 5143c, section 26(a) contains evidence that the legislature considered medical care and treatment of its wards to be among the responsibilities of the agency. It provides that:

> For the purpose of carrying out its duties, the Council is authorized to make use of law enforcement, detention, supervisory, medical, educational, correctional, segregative, and other facilities, institutions and agencies, within the State. . . .

In addition to these very broad guidelines, the agency was given extensive rule-making powers, article 5143c, section 22; and the power to order a child's confinement "under such conditions as it believes best designed for his welfare and the interests of the public," article 5143c, § 18. The 1957 legislation reorganized the system again, but left the substantive provisions quoted above virtually intact.

Summarizing the historical grant of authority to TYC and its predecessors, we conclude that this authority was broad indeed. Prior to 1949 it plainly included the power to consent to medical care. Nothing in the 1949 and 1957 enactments changed that. When an emergency situation required hospitalization of a TYC ward, the superintendent of the school signed the hospital's consent form. For most matters, however, no consent form was required because most ordinary medical care was provided by the schools themselves. Every TYC institution has and has had for many years a staff physician, a staff dentist, a staff psychiatrist and a staff of several nurses.

When the legislature enacted the Family Code, it did not repeal any section of article 5143d. On the contrary, the statement of purpose in section 51.01 of the Family Code indicates that the broad aims and grant of power under article 5143d were to be continued undiminished. It was again emphasized that the purpose was to "provide for the care, the protection, and the wholesome moral, mental, and physical development of children" coming within the provisions of Title 3 of the Family Code. Section 51.01(1). (Emphasis added). According to article 51.01(4), the state intends to give its wards "the care that should be provided by parents." Under article 5143d, section 23(a) TYC is enjoined to provide for the needs of a child "as those needs would be met in an adequate home." Rather than limiting the authority of the state to act to provide care for delinquent children, the drafters of the Family Code intended to give the state adequate power to upgrade the quality of services provided. Dawson, Commentary on Title 3, Texas Family Code, 5 Tex. Tech. L. Rev. 509 (1974). It was considered that the state would be acting as a "parent."

TYC is authorized to consent to medical treatment of its wards when parents have not responded to a request for consent. The conclusion that TYC has the power to consent to medical care for its wards is thus supported by the historical practice and the statutory scheme creating TYC. It would be anomalous to find that the legislature, having charged TYC with the care of delinquent youths, failed to grant the agency the power to consent to such care on behalf of its wards. The order of a juvenile court committing a child to TYC should be construed as a judicial order, within the meaning of section 12.04 of the Family Code, which grants to TYC, as the child's guardian, a power to consent to medical care which supersedes that of the parents.

Turning to the second question, we find that its resolution is slightly more complex. This is so because TYC's power is limited. TYC's guardianship powers under article 5143d extend only so far as is necessary to accomplish the statutory purpose. While its authority supersedes the power of the parent in many respects, some residuum of parental power remains. For example, TYC may not require its wards to submit to religious training because the First Amendment to the Constitution of the United States prohibits it. Parents may do so. In the area of medical care, the state's power to consent to medical treatment and procedures extends only to those which are reasonably calculated to improve a child's prospects for future health and rehabilitation, and thus for reintegration into society. We conclude that while TYC has the power to override some parental objections, its decisions would be subject to attack by a parent or a guardian ad litem of the child, on the ground that the decisions would not be in the child's best interest. In such a situation the wishes of the child would be extremely important. The resolution of

this conflict would depend upon the nature of the medical procedure proposed and the relative weight of the various interests of the parent, child, and state which it involved. This balancing of competing interests by a court comports with the scheme envisioned by section 35.01 of the Family Code. It is important to note, however, that section 35.01 does not govern the situation being discussed. When TYC has notice of a parental objection, it should seek a judicial determination of its authority in a court having jurisdiction of the child.

Even in the face of parental objections, TYC has independent authority to compel treatment of its wards for infectious or contagious diseases. Jacobson v. Massachusetts, 197 U.S. 11 (1905); Abney v. Fox, 250 S.W. 210 (Tex. Civ. App. — Austin 1923, writ ref'd). It is also true that a minor may consent to the diagnosis and treatment of any infectious, contagious, or communicable disease which is required by law or regulation to be reported to a local health officer. Sec. 35.03 Texas Family Code. Such laws and regulations exist in Texas. See V.T.C.S. art. 4477, Rules 1-33. In an emergency situation, and possibly in other situations, actual consent of either parents or child is not necessary since consent will normally be implied. See Moss v. Rishworth, 222 S.W. 225 (Tex. Comm'n App. 1920), jdgmt. adopted.

In answer to your third question, the objections of a minor to medical treatment may in the ordinary course of things be overridden by TYC. TYC always has the duty to act in the child's best interest, and a decision by TYC to require one of its wards to undergo any particular medical treatment would be subject to attack on this ground, but we think that requiring medical treatment is generally within TYC's grant of authority under article 5143d. We note, but do not address, the question of the extent of the constitutional right articulated in Roe v. Wade, 410 U.S. 113 (1973). This right will affect TYC's power to compel medical treatment in certain cases.

## SUMMARY

TYC has authority to consent to medical care for its wards in the absence of parental consent. When TYC has notice of a parental objection to medical treatment the TYC should seek a judicial determination of its authority. TYC may provide medical care to its wards even though they may object.

Very truly yours,

MARK WHITE
Attorney General of Texas

JOHN W. FAINTER, JR.
First Assistant Attorney General

TED L. HARTLEY
Executive Assistant Attorney General

Prepared by Steve Nagle
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

C. Robert Heath
Martha Allen
David B. Brooks
Bob Gammage
Susan Garrison
Rick Gilpin
Steve Nagle
William G Reid
Bruce Youngblood