## Shock Therapy in State Hospitals

WOODWARD, Deputy Attorney General, May 18, 1948.—The Department of Justice is in receipt of your request for an opinion regarding the legality of State mental hospital superintendents proceeding with certain specific psychiatric therapies on patients committed to their custody, without first obtaining properly witnessed written permissions from the patients' nearest responsible relatives. In support of your request, you furnish the following information, stated substantially in the language of your request.

The specific therapies referred to are the so-called "shock" treatments of various types and the use of malaria fever. In the interests of prompt treatment of mental patients, some of said superintendents feel that the prerogative of using reasonable skill and judgment may permit them to proceed, when written consent is not immediately available, with specialized therapies which have become recognized as standard procedure in medical practice, and which have long since been proven clinically as effective and necessary for certain mental disorders.

Malaria fever therapy is one of the most effective treatments for certain types of mental illness caused by syphilitic infection of the brain and central nervous system. This specific treatment has been recognized since 1918, and especially indicated in cases of general paresis. Complications in selected cases are of less than one percent incidence. Fatalities are practically negligible. The treatment by malaria fever does not cause loss of consciousness.

The "shock" therapies came into prominence more than 15 years ago, when the use of insulin was introduced to produce coma in certain mental diseases. Other types of shock treatments were rapidly developed, but are becoming obsolete, except for the extensive more practical use of electroshock therapy, which has been widely recognized in the past 10 years. These so-called shock treatments produce unconsciousness, and are frequently associated with convulsions. The electroshock is now accepted as specific for mental illnesses showing extreme agitation and mental depression. The insulin coma treatment has a place in certain types of dementia præcox or schizophrenia. Fatalities in shock therapies are practically unknown, and complications, such as fractures, have been reduced to less than one half of one percent incidence.

Although relatives are routinely advised regarding the nature and implications of the treatment, difficul-

16

ties sometimes ensue, in that there may be a delay of weeks or months required for relatives to investigate to their own satisfaction before signing such a permit. Furthermore, uninformed lay advice, ignorance, and general prejudice, especially from uncoöperative families, may deprive a patient of a definite chance for improvement or recovery.

Consequently, months and even years of additional care, at the expense of the Commonwealth, have resulted for large groups of patients to whom specific treatments were denied. Depression cases have committed suicide, disturbed cases have continued with unnecessary violence, and among such untreated patients, there has been a definite contribution toward the secondary problems of overcrowding and difficult management.

From one of the best State mental hospitals, which routinely required written permission before instituting such special therapies, but which now no longer exacts formal permission, because of confidence in their technique and results, the following comparative statistics are submitted:

*Discharged from hospital in less than one year's treatment*

|  | *1930-1932* | *1940-1942* |
|---|---|---|
| (Malaria fever) Syphilis of central nervous system | 12.9% | 26.7% |
| (Electroshock) Manic depressive | 59.2% | 68.7% |
| (Insulin and/or Electroshock) Dementia præcox | 35.6% | 46.1% |
| (Electroshock) Involutional | 39.3% | 52% (75% in 1944-45) |

The foregoing statement of facts, which you furnished, raises the question whether, in cases where patients are committed for care and treatment to State

mental hospitals, the power and duty to give such patients the necessary, proper and indicated standard treatment should be prevented or impeded by the unavailability, or the occasional lack of coöperation, of some relatives who might later retaliate by lawsuits, on the basis that explicit permission to administer such treatments was never given.

The original request for an opinion relates particularly to shock treatments and malaria fever treatments. We are informed that the closest approach in importance to shock treatments is the use of malaria fever for syphilis of the brain; and that in the latter cases, it is not customary to request permission to use the treatments, because they have become part of the general standard procedure.

The request deals principally with electric shock treatments, and we have since been informed that no special consideration need be given to malaria fever treatments. Therefore, what is hereinafter discussed principally concerns only electroshock therapy. Furthermore, the subject of general surgical operations upon mental patients of State hospitals of this Commonwealth is not within the scope of the purposes of this opinion.

The electric shock treatment herein referred to consists of weak electric currents (115 volts, 1 ampere), applied to the temples; due to the sudden convulsion which usually occurs at the beginning of the treatment, sometimes there is a fracture of the arm or shoulder, but rarely have there been any such incidents in State mental hospitals.

We understand that shock treatments have been used by the State mental hospitals of this Commonwealth since 1939, and that during this time, there have been no deaths from the use of these treatments. There is at present a patient population in State mental hospitals of about 35,000; depression cases in which

shock treatment is indicated amount to about one third of the above total.

Mental patients are generally legally, mentally and medically incapable of giving consents to methods of treatment or other matters relating to their care and maintenance; therefore, it may be necessary to attempt resort to friends or relatives, who may prove unavailable, or unwilling to coöperate.

There is an indeterminate minimum of about five percent of patients with whom difficulty is experienced in obtaining consents. Obviously, it is desirable to avoid the necessity of obtaining such consents, if possible, especially since such consents are generally considered unnecessary, because the treatments now constitute a recognized established procedure.

There are many other forms of treatment in use in the State mental hospitals in which consents are not considered necessary as follows: Infra red rays, ultra violet rays, insulin, drugs—orally and by needles, and hydrotherapy—wet packs, tubs, etc.

If written consent is necessary in any form of treatment, where is the line to be drawn?

Since superintendents of State mental hospitals throughout the Commonwealth differ in their views and practices concerning the question whether consents in such cases are necessary, it is advisable to establish a uniform practice. In order to do so, careful consideration must be given to the necessity, nature and beneficial results of such treatments.

Treatment of mental diseases by artificially inducing convulsions with electricity began in Italy in 1938; since then it has accomplished remarkable results, and has proved to be so satisfactory that it is now generally used. This treatment is discussed in an article entitled, "Shock Therapy Saves Minds", in Hygeia, The Health Magazine, published by the American Medical Association, July 1947, at pages 516-517, wherein it is stated, inter alia, as follows:

"The presently accepted procedure for shock therapy involves the passing of about 115 volts of alternating electric current through the patient's head for a period of about three-tenths of a second. The machine by which this shock is administered is designed to prevent the delivering of more than one ampere of current and to shut off automatically as soon as the current has passed for the desired length of time. Thus it is impossible for the patient to receive such a heavy shock as to endanger his life.

. . . . . . . .

"The first effect on the patient, as the current passes through his brain, is to cause him to lose consciousness. Thus the patient is entirely unaware of the convulsion through which he passes and retains no memory of the treatment."

And at pages 550-552:

"One psychiatrist has already administered 35,000 shock treatments with only one death and this death was the direct result of coronary disease.

"The over-all mortality rate from shock therapy during the few years it has been in use in the United States averages about one death for every two thousand cases treated. In view of the fact that many cases have received numerous individual treatments, this mortality rate is surprisingly low. In fact, it is even lower than in many types of surgery.

"The violent muscle contraction which occurs as soon as the current passes through a patient's brain has been, in some cases, the means of causing an injury to the patient's bones. Recent improvements in technique have materially reduced the number of such complications. Furthermore, the seriousness of these skeletal injuries is minimal compared with the psychic benefits to be derived from electric shock therapy.

. . . . . . . .

"To date, it is the most effective, the most beneficial, and the most easily administered therapeutic agent

for the functional psychoses. It is not a cure-all but in properly selected cases and in competent hands it benefits about 80 percent of the cases, producing a practical cure in approximately half of these. . . ."

From the foregoing article, two facts are noticeable: One, that the mortality rate from shock therapy during the years it has been in use in the United States averages about one death for every 2,000 cases treated, which is a surprisingly low mortality rate, even lower than in many types of surgery; and the other, that it is the most effective, the most beneficial, and the most easily administered therapeutic agent for the functional psychoses.

In "Shock Treatments and Other Somatic Procedures in Psychiatry", (1946), by Lothar B. Kalinowsky, M.D., and Paul H. Hoch, M.D., page ix, it is stated, inter alia, as follows:

"The shock treatments today are indispensable tools of psychiatric therapy; . . ."

Generally, electroshock treatments are not considered emergency treatments; however, in such cases the public demands prompt treatment, and that is what the Commonwealth aims to provide, especially since, in many cases, the need for shock treatments is urgent.

In the Journal of the American Judicature Society, vol. 31, August 1947, no. 2, pp. 47, 48, in an article entitled, "Improved Legal Procedure for the Care of the Mentally Ill", by Arthur E. Moore, judge of the Probate Court for Oakland County, Pontiac, Michigan, it is stated:

"A lady needed shock treatment for mental illness short of insanity. Neither the writer nor the head of the State Hospital could convince her family of the need. Not being insane she could not be hospitalized and treated against her will. Three days later she murdered a man."

Concerning the question whether electric shock treatments are considered standard medical practice, The

Pennsylvania Medical Journal, January 1948, vol. 51, No. 4, pp. 405, 408, states in part:

". . . The use of insulin and other drugs in shock therapies has opened a number of new avenues of therapeutic approach, and together with the electro-shock method constitutes a procedure that has spread all over the world. . . ."

The first question which logically presents itself is whether shock treatments, or any other specific forms of treatment, are expressly authorized by statute in this Commonwealth.

The care and treatment of mental patients is governed by The Mental Health Act of July 11, 1923, P. L. 998, as amended, 50 PS §1, et seq., which is a revision and codification of previous legislation with respect to insanity, and which, in conjunction with related laws, furnishes a complete method of procedure for the care, treatment and maintenance of mental patients.

The terms, "mental illness," "mental patient," "mental hospital," "hospital for mental diseases," and "care," are defined by section 103, as amended, of The Mental Health Act of 1923, supra, 50 PS §3, and are as follows:

" 'Mental illness,' 'mental disease,' 'mental disorder' shall mean an illness which so lessens the capacity of the person to use his customary self-control, judgment, and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under treatment, care, supervision, guidance, or control. The term shall be construed to include 'lunacy,' 'unsoundness of mind,' and 'insanity.'

.   .   .   .   .   .   .   .

" 'Mental patient' shall mean any person who is or is thought to be mentally ill, mentally defective, epileptic, or inebriate, or who is or has been an inmate of any hospital, school, or place for such persons or for whom admission thereto is being sought.

" 'Mental hospital' shall mean any State, semi-State, or licensed hospital, institution, school, or place, public or private, for the care of mental patients.

" 'Hospital for mental diseases' shall mean any State, semi-State, or licensed hospital, house, or place for the treatment and care of persons mentally ill.

.    .    .    .    .    .    .    .

" 'Care' shall include reception, detention, custody, care, treatment, maintenance, support, segregation, education, culture, training, discipline, improvement, occupation, employment, medical and surgical treatment and nursing, food, and clothing."

From the foregoing definitions, it will be observed that an essential characteristic of "mental illness" is the necessity for control of the patient; and that the "care" of mental patients is predicated largely upon custody, detention and discipline; therefore, the rules and practices for the care and treatment of mental patients must not be confused with those governing the voluntary confinement of patients in medical and surgical hospitals.

This situation is reflected in section 303 of The Mental Health Act of 1923, supra, as amended, relating to admissions to mental hospitals, which provides, in part, as follows:

"The superintendent of said hospital shall receive the said patient, and may *detain him therein until said patient shall have recovered or shall be removed according to law.*" (Italics supplied.)

This section clearly precludes the patient's exercising any voluntary control over his confinement in a mental hospital.

While an examination of the foregoing statutes fails to reveal any express authority for the use of shock treatments, or other specific forms of treatments, that authority may be implied from the quoted definitions of mental illness, care, etc., and the inherent concepts of custody, control, detention, etc., to be exercised

"until said patient shall have recovered or shall be removed according to law." (Section 303, supra, 50 PS §43.)

It may be stated generally that admission to a hospital for mental diseases may be made upon voluntary application, upon application of relatives or friends, or others, and upon order of court.

Under the provisions of section 303, as amended, of The Mental Health Act of 1923, supra, 50 PS §43, the form approved, adopted and used by the Department of Welfare, for the commitment of mental patients to State-owned institutions contains, inter alia, the following language:

". . . the person named therein be committed to the . . . State Hospital *there to remain until* he shall have *recovered or* shall have been *removed according to law*; and this shall be sufficient warrant for said commitment." (Italics supplied.)

Under section 304, as amended, of said act, 50 PS §44, the form of the order for the commitment to other than State-owned institutions, contains, inter alia, the following language:

". . . *to be detained and treated as a mental patient until he shall have recovered or* shall have been *removed according to law*; and this shall be sufficient warrant for said commitment. . . ." (Italics supplied)

In accordance with section 307, as amended, of said act, 50 PS §47, the form of the order to be made when the court commits a person for observation, diagnosis and treatment upon an application made to the court by the guardian, committee, or any relative or friend contains, inter alia, the following language:

". . . be committed to the . . . Hospital *to be detained for observation, diagnosis and treatment* . . . and this shall be sufficient warrant for said commitment." (Italics supplied)

The theory of the forced detention of mental patients is referred to in the Yale Law Journal, vol. 56, August 1947, No. 7, p. 1181, wherein it is stated, inter alia, as follows:

"In the commitment process, as provided for by state statute, therefore, a mentally ill person may have to be taken to a hospital and detained against his will by an exercise of power authorized by law."

There is nothing in the form of the foregoing commitments, which gives a mental patient, or his friends, relatives, guardian, or other person, the right to determine what methods of treatment, either with or without written consent thereto, may be administered in his particular case, during his detention in a mental hospital. Ordinarily, except in cases of guardians of the persons of minors, there is no authority vested in a patient's friends, relatives, guardian or other persons which entitled such persons to give such consent on behalf of such patient, which would be binding upon the patient and protecting to the Commonwealth and its officials, except possibly by estoppel.

The powers and duties of the boards of trustees of State institutions, and the superintendents thereof, are defined in the several sections, relating thereto, of The Administrative Code of April 9, 1929, P. L. 177, as amended, 71 PS §51, et seq.

Under section 2318, as amended, of said code, 71 PS §608, the board of trustees of each State institution has general direction and control of the property and management of such institution; under section 2318(a), the superintendent of the institution, subject to the authority of the board, shall administer the institution in all its departments; and under section 2318(d), subject to the approval of the Secretary of Welfare, the board has the power to make bylaws, rules and regulations for the management of the institution.

Under the foregoing provisions, either the superintendent, or the board of trustees, of a State mental hospital has the implied authority, in the first instance, to determine the policy and procedure of the institution in the care and treatment of mental patients, including the treatment by electric shock therapy, or other treatment, and whether such treatments may be given without the consent of the patient, his friends, relatives, or others. The care and treatment of patients must be within the sound discretion of the duly appointed authorities of the institution.

That the Department of Welfare has the implied authority to determine whether or not the within mentioned therapies may be used in State mental hospitals, and without express written permission therefor, appears from section 2307 of The Administrative Code of 1929 as amended, supra, 71 PS §597, which is as follows:

*"The Department of Welfare shall have the power,* and its duty shall be, from time to time, *to recommend* and bring to the attention of the officers or other persons having the management of the State and supervised institutions *such standards and methods as may be helpful* in the government and administration of such institutions and *for the betterment of the inmates* therein, whereupon it shall be the duty of such officers or other persons to adopt and put into practice such standards and methods." (Italics supplied.)

The rights of mental patients, relating to communication with counsel, etc., religious freedom, employment, sale of products, written communications, habeas corpus, discharges and medical attention are set forth in section 601 of The Mental Health Act of 1923, as amended, supra, 50 PS §171, and are as follows:

"Every mental patient in any institution or place for mental patients, within the jurisdiction of the department, shall have the right:

"(a) To communicate with his counsel and with the commissioner, and to be alone at any interview with his counsel or commissioners or representative of the department;

"(b) To religious freedom, and to be visited by any minister of any religious denomination: Provided, That the religious services rendered by such minister shall be personal to the mental patient desiring the same, and shall not interfere with the established order of religious services in such institution or place;

"(c) To be employed at a useful occupation in so far as the condition of such patient may permit, and the institution or place is able to furnish useful employment to the patient;

"(d) In the discretion of the physician in charge, to sell articles, the product of his individual skill and labor, and the produce of any small individual plot of ground which may be assigned to and cultivated by him, and to keep or expend the proceeds thereof or send the same to his family;

"(e) To be furnished with writing materials, and reasonable opportunity, in the discretion of the physician in charge, for communicating, under seal, with any person or persons outside of such institution or place, and such communications shall be stamped and mailed;

"(f) To a writ of habeas corpus to determine whether or not he is properly detained as a mental patient, and the respondent in any such writ shall be required to pay the costs and charges of the proceedings unless the judge shall certify that, in his opinion, there were sufficient grounds for detaining the patient and putting him to his writ;

"(g) To be discharged as soon as, in the opinion of the medical attendant of such institution or place, he shall be restored to reason and competent to manage his own affairs;

"(h) To be visited and examined, at all reasonable hours, by any medical practitioner designated by him, or by any member of his family or 'near friend', with the sanction of a judge of a court of record of the county in which such mental patient resided prior to his commitment to such institution or place; and, with the consent of the patient and of the physician in charge of such institution or place, such medical practitioner may attend such patient for all maladies, other than mental illness, in the same manner as if the patient were in his own home."

There is nothing in the above quoted section, either expressed or implied, which gives to a mental patient the right to, or places the duty upon the Commonwealth to secure, the consent of the patient or of someone legally authorized to give it for him, before proceeding with any specific methods of treatment; accordingly, it may be inferred that the mental patient does not have such right; and that, therefore, the Commonwealth is not required to obtain such consents.

"An insane person has no constitutional or statutory right of liberty in the ordinary and conventional sense of that term. Accordingly, the right to restrain an insane person is not precluded by the general law which provides that no one shall be deprived of life, liberty, or property, without due process of law. It is not disputed that *the commitment of insane persons to appropriate institutions for confinement and care, when reasonably necessary for the protection of the public or of the person so afflicted, is a proper exercise of the police power of the state*": 28 Am. Jur. 672, 673 §26. (Italics supplied.)

"*Insane persons are considered as wards of the state; and the state as parens patriæ may make provisions for their protection,* provided they are not in contravention of constitutional provisions. *Statutes to this effect are liberally construed to the end that their pur-*

*pose may be effectuated*": 32 C. J. 627 §162. (Italics supplied.)

It must be borne in mind that the care, treatment and maintenance of mental patients is a governmental function (Chester Co., etc., et al. v. Commonwealth et al., 341 Pa. 49, 57 (1941)), and that the basic consideration in this function is to serve the best welfare of the patient, and that this function is best carried out by the authorized agencies of the Commonwealth, uncontrolled by the dictates of the patient, his friends, relatives or others.

" 'The jurisdiction assumed to be inherent in a State over that unfortunate class of persons within its limits, who are deprived of the use of their mental faculties may be said to rest upon two grounds—First: Its duty to protect the community from the acts of those who are not under the guidance of reason, and, secondly, its duty to protect them, as a class incapable of protecting themselves, . . .' Matter of Colah, supra [quoting Bliss v. Bliss, 133 Md. 61, 104 A 467, 471]": 32 C. J. 627 n. 94 §162.

There is a dearth of Pennsylvania decisions on the subject; decisions in other jurisdictions are conflicting; and therefore, not conclusive.

Somewhat analogous situations have arisen in cases where treatments and operations, employed upon certain individuals, such as sterilization, compulsory vaccination, asexualization, treatments for venereal disease, etc., were done pursuant to statutes. In such cases, the courts have held that the States, pursuant to their police powers, had authority by law to impose upon such persons, the compulsory examinations and treatments.

In the article in the Journal of the American Judicature Society, supra, it is further stated:

"In many instances the Courts have protected the public and the patient by provisions for mandatory

care, viz., under contagious disease statutes and venereal disease laws. In addition many states have provided for compulsory care of sexual psychopaths. (Minnesota v. Pearson, 60 S. Ct. 523; Dittrich v. Brown, 9 N. W. (2d) 510, 158 A. L. R. 1228.) We have also protected society through sterilization statutes. (Jacobson v. Massachusetts, 197 U. S. 11, 49 L. Ed. 643.) . . ."

In 1921-22 Op. Atty. Gen. 320, it was expressly stated:

"Prisoners in penal institutions cannot object to examinations and treatment for venereal diseases as provided by the Act of April 26, 1921, P. L. 299."

We are constrained to certain views expressed in the opinion of the Attorney General of the State of Vermont to the Vermont State Hospital at Waterbury, dated March 29, 1945, in which it is stated, inter alia, as follows:

"There is a general rule of law that strictly public institutions, created, owned, and controlled by the state, such as state asylums for the insane, are not liable for the negligence of their agents. It is stated in 26 Am. Jur. at pages 594 and 595:

" '. . . They are held to be governmental agencies brought into being to aid in the performance of the public duty of protecting society from the individual unfortunate or incompetent in mind, body, or morals, and the rules applicable to municipal corporations and public officers generally are applied. This seems to be the rule whether the action is against the state, a county, a municipal corporation, or a hospital corporation created by the state to act as its agent in the case of those physically or mentally unwell. There seems to be no dissent from the rule wherever applied to a case in which an injury to the person is considered, whether the injured person is a stranger, a patient, an employee or servant, or an invitee on the hospital premises. . . .'

"Such general rule, I believe, applies to Vermont and the Vermont State Hospital by reason of the fact that *this institution is an instrumentality of government, and the employees therein are agents of the government in the performance of a public duty.*

"In case a person has been lawfully committed to your hospital (this excludes the private patient), the law requires such person to be kept until he is lawfully paroled or discharged.

*"We do not have any statutory rules defining the method of treatment, administration of medical aid, etc. In the absence of statutory definition, the care and treatment of inmates must be discretionary in the duly appointed officers of the institution.* It has been many times held by the Vermont Supreme Court that where an officer is entrusted with a duty which requires the exercise of his judgment and discretion, he is entitled to proceed in such duty without judicial interference. One of the most recent cases where this rule is succinctly stated is that of Nadeau v. Marchessault, 112 Vt. 309, where it is stated at page 311:

" 'Where a public officer performs a judicial function involving the exercise of judgment and discretion, and acts within the limits of his authority, he is not liable for negligence in the execution of his duty at the suit of a private individual claiming to have been injured thereby.'

"Basing my conclusions upon the authorities above mentioned, it is my belief that you may administer in your own sound discretion such treatment to an inmate of the institution as is indicated after diagnosis as being necessary or proper for his welfare.

"As to the matter of securing the consent of the inmate's relatives, it is my belief that such is not necessary as a matter of law, but where it can be obtained, it is my feeling such a course is one to be commended." (Italics supplied.)

The increasingly popular use of electroshock treatments is indicated in the syndicated column entitled, "That Body of Yours," by James W. Barton, M. D., in The Patriot, Harrisburg, Pa., Thursday, February 19, 1948, showing the extent to which electroshock treatments are now given in physicians' offices, which is, in part, as follows:

"It will come as a pleasant surprise to patient and family to learn that electric shock treatment, which is more popular with physicians and patients than insulin or matrazel shock treatments, now can be given in the physician's office with no embarrassment to anyone.

"In the Journal of Nervous and Mental Diseases, New York (The Journal of Nervous and Mental Disease, an Educational Journal of Neuropsychiatry, founded in 1874, July, 1947, Volume 106, No. 1, page 1, in an article entitled, 'The Efficacy of Electroshock Therapy in Preventing or Shortening Hospitalization') Dr. E. F. Kerman reports the results obtained by 242 patients treated in his office by electric shock. . . .

"Being able to avoid commitment to a mental institution, by electroshock treatment in the physician's office, is of real benefit to the patient." (Parentheses ours.)

In "The Journal of Nervous and Mental Disease", supra, it is stated, inter alia, page 2, as follows:

"Only a few words of explanation will be given here since *the technic of shock therapy is well standardized.*"

And at pages 8 and 9:

"Commitment to a state hospital usually means, at best, several months of treatment. . . .

"The history of our American mental hospitals indicates that originally the mentally ill were cared for in jails, workhouses and almshouses. Later these were gradually replaced by mental hospitals, but even today many patients reach the State hospital after having spent a variable period of time in jail, and many others

32

are accompanied to hospitals by members of the police force. The reason for this is obvious, since the primary motive behind such action is to remove from society an individual whose behavior is either aggressive or potentially so, or a person whose productions are bizarre to the point of constituting a public nuisance or embarrassment to his family or a. patient who is considered suicidal. *If aggressive behavior of the patient, directed either toward society or toward himself, may be modified rapidly by the extramural administration of electroshock, so that the patient becomes comfortable and the even tenor of social activities is not disturbed, one may see that some good has been accomplished.*" (Italics supplied.)

Treatments by electric shock are less uncomfortable and less dangerous to the patient than insulin or metrazol shock treatments.

The fact, concerning which there can be no doubt, must be stressed that electroshock therapy has become recognized as standard procedure in mental health practice, as set forth in conjunction with numerous phases of the discussion throughout this opinion.

Although the term "care", as defined by The Mental Health Act, supra, includes "surgical treatment", nevertheless, and as hereinbefore stated (p. 10), surgical operations are not within the scope of this opinion. Furthermore, electroshock therapy is distinct from surgery or surgical operations.

" 'Therapy' is the treatment of disease, and 'surgery' is therapy of a distinctly *operative* kind": 40 W. & P. 851. (Italics supplied.)

"A 'surgical operation' begins *when opening is made into the body and ends when this opening has been closed* in a proper way after all appliances necessary to the successful operation have been removed from the body, and after patient has been duly cared for according to condition, and in interest of safety": 40 W. & P. 853. (Italics supplied.)

In electroshock therapy, herein discussed, there is no use made of surgical instruments, nothing is taken away from the patient, such as removal of organs or tissue, and there is no cutting whatever, even of the skin of the patient.

There can be no doubt that electroshock treatments may be given to State mental patients, although consent is either not obtained, or is refused. Under its police power, the State provides for the confinement of persons mentally ill—it may be for the duration of their lives. This is well established, although such confinement may be the most serious interference with personal liberty. It has also been held that, under the police power, the legislature may require compulsory treatment for the prevention or treatment of incurable diseases.

In Jacobson v. Massachusetts, 197 U. S. 11 (1905), the Supreme Court of the United States sustained the constitutionality of the Massachusetts statute which provided that the board of health of the town might require the vaccination of all inhabitants thereof if, in its opinion, such were necessary for the public health or safety.

The State court had excluded all offers of the defendant to prove the injurious effects of vaccination, and took judicial notice of the fact that vaccination was a preventive of smallpox.

In the opinion, Mr. Justice Harlan stated (p. 31):

"Whatever may be thought of the expediency of this statute, it cannot be affirmed to be, beyond question, in palpable conflict with the Constitution. Nor, in view of the methods employed to stamp out the disease of smallpox, can anyone confidently assert that the means prescribed by the State to that end has no real or substantial relation to the protection of the public health and the public safety. Such an assertion would not be consistent with the experience of this and

other countries whose authorities have dealt with the disease of smallpox. . . ."

In Minnesota ex rel. Pearson v. Probate Court of Ramsey County et al., 309 U. S. 270 (1940), the Supreme Court of the United States sustained a statute of Minnesota which authorized the confinement of a person proved to be of a "psychopathic personality".

The Supreme Court of the United States accepted the interpretation of the Supreme Court of Minnesota that a "psychopathic personality" included (p. 273) :

". . . those persons who, by an habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the object of their uncontrolled and uncontrollable desire."

In Buck v. Bell, 274 U. S. 200 (1927), the Supreme Court of the United States sustained a Virginia statute which provided for the sterilization of mental defectives.

It appeared that the mother and grandmother of the defendant had also been mental defectives. In the opinion of the court, Mr. Justice Holmes stated (p. 207) :

"We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. Jacobson v. Massachusetts, 197 U. S. 11. Three generations of imbeciles are enough."

We are of the opinion, therefore, and you are accordingly advised that the superintendents of State mental hospitals, in their sound discretion, may administer to patients of State mental hospitals, electric shock and such other treatments, which in the exercise of reasonable skill and judgment, are indicated, after observation and diagnosis, as being necessary and proper for the patients' best welfare, without first obtaining written permission for such treatments from such patients, their friends, relatives, guardians or other persons who may be legally entitled to give such consent on behalf of such patients; while such consent may be desirable in some cases, it is not essential under the laws of this Commonwealth.