## IN THE MATTER OF REVEREND FRANK WILLIAMS.

(Filed 20 January, 1967.)

**1. Contempt of Court § 2—**

A person who wilfully refuses to be sworn as a witness is equally guilty of contempt of court with one who, having been personally sworn as a witness, refuses to answer a proper question, and such contumacious refusal is direct contempt and comes within the meaning of the statute even though the contemner believes it to be his moral duty to refuse to testify. G.S. 5-5.

**2. Contempt of Court § 7—**

The maximum punishment for direct contempt in refusing to be sworn as a witness is a fine not to exceed $250 or imprisonment not to exceed 30 days, or both, in the discretion of the court. G.S. 5-4.

**3. Contempt of Court § 2—**

The motives of a person which impel him to act in direct contempt of

court do not excuse such contempt, even though his motives arise out of religious convictions.

**4. Contempt of Court § 6—**

Summary punishment for direct contempt committed in the presence of the court does not contemplate a trial at which the person charged with contempt must be represented by counsel, and therefore sentence for contempt does not deprive the contemner of his liberty without due process of law.

**5. Criminal Law § 77—**

G.S. 8-35.1 does not authorize a minister to refuse to be sworn or to testify when the person against whom such testimony is directed does not invoke the privilege.

**6. Same—**

Fear of loss of esteem or apprehension of decrease in ability to render service in the community does not justify a witness in refusing to testify when the matter does not come within the purview of privileged communications.

**7. Constitutional Law § 22—**

Religious freedoms protected from congressional action by the First Amendment of the Federal Constitution are protected against State action by the Fourteenth Amendment; however, religious freedoms are equally protected by the provisions of Article I, § 26, of the Constitution of this State.

**8. Same—**

Religious freedoms protected by constitutional provisions are not limited to ministers or members of organized religious bodies but extend to all citizens.

**9. Same—**

The constitutional protection of religious freedom is not absolute but must give way to the interest of the State in the exercise of constitutional regulations necessitated by compelling State interests.

**10. Same; Contempt of Court § 2—**

The State has a compelling interest that a person called as a witness should be sworn and should testify in the administration of justice between the State and one charged with a serious offense, and therefore a minister called as a witness in such prosecution may be held in contempt of court upon his refusal to be sworn as a witness, notwithstanding he asserts that his refusal is a matter of religious conscience.

ON *certiorari* to review the judgment of *Brock, S.J.*, at the 23 May 1966 Criminal Session of GUILFORD, Greensboro Division, adjudging the petitioner to be in contempt of court and imposing punishment therefor.

At the trial of a criminal action, entitled *State v. Sylvester Smith*, in which the defendant was indicted for rape, the Reverend Frank Williams, hereinafter called the contemner, was subpoenæd as a wit-

ness both by the State and by the defendant. When called as a witness for the State, he refused to be sworn or to take the stand as a witness.

Thereupon the judge asked, "Do you care to state any reason why you refuse?" The contemner having indicated that he did so desire, the judge sent the jury in the case then on trial from the courtroom and the following dialogue occurred:

"THE COURT: All right. Proceed.

"REVEREND WILLIAMS: My members are involved in this case here in this courtroom.

"THE COURT: Your members? What do you mean by that?

"REVEREND WILLIAMS: Members of the church that I am pastor of. There are four of them involved in this case. Two on my left and two on my right, and it seems to me that I'm being asked to take sides in this matter which I cannot do.

"THE COURT: You don't mean to indicate that anyone has asked you to say anything but to testify as to the facts as you knew them, do you?

"REVEREND WILLIAMS: Well, I cannot testify under any circumstances because my members are involved. I have been summoned here by the defense. I've spoken to the Solicitor and I made myself clear to them my position as a pastor of a church and as my members being involved. I made it clear to the lawyer. I made it clear to the sheriff of my position but I am still being summonsed here when I cannot take any position at all for they have both discussed this matter with me. They have both confided in me and it would be against the position that I hold to take the stand at all in this case.

"THE COURT: Do you understand that if there is any privileged communications between you and the defendant, or the defendant's wife, or the child that's involved that that is a question for them to raise and not for you?

"REVEREND WILLIAMS: Well, they came to me as their pastor. They confided in me as their pastor, and I think I would be less than their pastor to take the stand in defense of one of these persons.

"THE COURT: You take the position then that regardless of what the merits of the case might be, that even though these people who have talked to you have now called you as a witness that you are justified in refusing?

"REVEREND WILLIAMS: I have discussed this matter with both of them, both Mrs. Smith and Mr. Smith, and they understand my position. It's not them that don't understand my posi-

tion. It seems as though it's the lawyer and the Solicitor who doesn't understand."

The court thereupon inquired of the counsel for Smith, the defendant then on trial, as to his client's wishes in the matter. This attorney advised the court that though he, as well as the solicitor, had subpoenaed the contemner, he had not been able to elicit any satisfactory information from him. The following exchange then occurred:

"THE COURT: Does the defendant [i. e., Sylvester Smith] object to his testimony on the ground that anything that he might have discussed with him constitutes a privileged communication?

"MR. FRANKS [counsel for Sylvester Smith]: May I confer with my client, Your Honor. He has talked with him more than I have [conference between attorney and Smith]. My client does not care to call him as a witness and would object, does wish to object to any privileged communication.

"THE COURT: You then would object to any testimony from this witness concerning any conversation he might have had with the defendant?

"MR. FRANKS: That is my client's wishes, Your Honor. He knows more what was said than I, I do not know.

"THE COURT: All right. Well, that would be a valid objection if entered on behalf of the defendant.

"MR. FRANKS: Yes, sir.

"THE COURT: I think, if there has been some confidential communication between him and his pastor that I would recognize it in this court as a privileged communication. However, that doesn't make objectionable any communication between the defendant's step-child and the pastor. It would as to the wife because that would be the same as her testifying.

"MR. FRANKS: Yes, sir.

"THE COURT: But as to the child, the communication between the child and the pastor. Mr. Solicitor, would there be any objection —

"MR. LOWE [the Solicitor]: Your Honor, that's exactly what I wanted to know. I wanted to know if he did visit the home of the Smiths on or near the weekend of the 4th of July, 1965 and if there he saw Cheryl Parks. I want to know if he visited that home and what time he visited that home.

"THE COURT: You are not asking for any communication —

"MR. LOWE: I am not asking for anything he said to them or that they might have said to him.

"MR. FRANKS:  That's perfectly all right with the defendant."

The court then addressed the contemner and the following exchange occurred:

"THE COURT:  All right. Now the Court will address itself again to the witness. Do you understand that as a matter of constitutional rights, that these people have a right to call a witness who might testify?

"REVEREND WILLIAMS:  Yes, sir. I understand that.

"THE COURT:  And do you understand that as a matter of law those rights may be enforced?

"REVEREND WILLIAMS:  I understand that also.

"THE COURT:  And now are you ready to take the stand and testify?

"REVEREND WILLIAMS:  I will not testify in this case under any circumstances."

Thereupon the court pronounced the following judgment:

"THE COURT:  Let the record show upon the questions and answers and explanation given by the prospective witness and from the explanation by the Solicitor of the general inquiry that he wishes to make of this witness concerning whether or not he went to the home of the defendant on this particular day and saw the child and the explanation on the part of the Solicitor that he did not intend to ask the witness to divulge any communication that he may have received from anyone; and after the Court having explained to the witness that it is his obligation under the subpœna to testify and the witness flatly refused to do so, the Court adjudges that the witness, Reverend Frank Williams, is in contempt of court and he is ordered in custody for a period of ten (10) days, I am sorry but you brought it on yourself."

To the foregoing judgment the contemner responded, "God Bless you, Your Honor," and was thereupon taken in custody by the sheriff.

On the following day the contemner, being then represented by two of his present counsel, filed a motion that he be released from the foregoing judgment of the court upon the following grounds:

(1) He is a duly ordained minister, pastor of the Mount Zion Baptist Church in Greensboro, and in his professional capacity received confidential information from members of his church and that to compel him to divulge this information would be in violation of his professional ethics and duty as a minister;

(2) Had he not been a minister, he would not have received "the above information";

In re Williams.

(3) To require him to testify under these circumstances violates his constitutional rights under the First and Fourteenth Amendments to the Constitution of the United States;

(4) To so require him to testify would violate his rights under the Constitution of North Carolina;

(5) The failure of the court properly to inform him of his constitutional right to counsel, the failure of the court to inform him of the nature of the charge or that he would be in contempt of court, and the failure of the court to appoint counsel to represent him violated his rights under the Sixth and Fourteenth Amendments to the Constitution of the United States and under the Constitution of North Carolina.

In support of this motion, the contemner filed his affidavit stating that he is an ordained minister and the pastor of such church; and that in his professional capacity he received confidential information from Sylvester Smith, and from "the other parties who serve as prosecuting witnesses"; that had he not held such position as minister, "none of the information sought would have been known to him"; to require him to divulge this "confidential information" would require him to breach the confidence of the persons involved, ruin his reputation in the church and community, and prevent him from properly carrying out his religious duties as a minister; that "the testimony sought was obtained through this confidential means and though it appears harmless, if divulged, would prohibit him from receiving further information."

This motion was heard on the day it was filed by the same judge who had on the previous day adjudged the contemner in contempt. At such hearing the contemner was represented by his said counsel. The court denied the motion, considering it both as an allegation of right, and as an appeal to the discretion of the court to modify the former order.

The contemner was thereupon released on bond pending his petition for *certiorari*, which was allowed, and a writ of *supersedeas* pending the decision of this Court upon such review was issued.

The contemner assigns as error both the original judgment and the order denying his motion for release.

*Attorney General Bruton and Staff Attorney Vanore for the State.*
   *Major S. High, Herman L. Taylor and Mitchell & Murphy for appellant.*
   *James Mattocks and Charles F. Lambeth, Jr., Attorneys for the North Carolina Civil Liberties Union, Inc., Amicus Curiæ.*
   *Daniel H. Pollitt of counsel.*

LAKE, J.  G.S. 5-1 provides:

"Any person guilty of any of the following acts may be punished for contempt:

"* * * 6.  The contumacious and unlawful refusal of any person to be sworn as a witness, or, when so sworn, the like refusal to answer any legal and proper interrogatory."

Webster's New International Dictionary, Second Edition, says:

"Contumacious implies stubbornness or perversity, esp. as manifested in willful contempt of any lawful summons or orders, as of a court; as a contumacious witness."

Black's Law Dictionary defines contumacy as "The refusal or intentional omission of a person who has been duly cited before a court to appear and defend the charge laid against him, or, if he is duly before the court, to obey some lawful order or direction made in the cause." To the same effect is Ballentine's Law Dictionary.

*In Re Hayes*, 200 N.C. 133, 156 S.E. 791, 73 A.L.R. 1179, affirmed a punishment summarily imposed by the Industrial Commission upon a witness who refused to answer a question properly propounded to him in a hearing. Connor, J., speaking for the Court, said:

"It has been uniformly held by this Court and by courts of other jurisdictions that the power to punish for contempt committed in the presence of the court, is inherent in the court, and not dependent upon statutory authority. [Citations omitted.] Without such power the court cannot perform its judicial function. This principle is especially applicable when the contempt consists in the refusal of the witness in attendance upon the court, after having been duly sworn, to answer a question propounded to him for the purpose of eliciting evidence material to the issue to be decided by the court."

The statute makes no distinction between one who, in the presence of the court, pursuant to its lawful subpœna, refuses to be sworn as a witness and one who, having been sworn, refuses to answer a proper question. In *Lamm v. Lamm*, 229 N.C. 248, 49 S.E. 2d 403, Ervin, J., speaking for the Court, with reference to punishment for contempt, said, "One acts wilfully when he acts knowingly and of stubborn purpose." The refusal of one subpœnæd as a witness to take the oath or to answer proper questions propounded to him, when done knowingly and intentionally, is contumacious and willful, within the meaning of this statute, even though such person believes it to be his moral duty to refuse to testify.

The contumacious and unlawful refusal, in the presence of the court, by one duly subpœnæd, to be sworn as a witness is direct contempt and may be punished summarily. G.S. 5-5; *Galyon v. Stutts,* 241 N.C. 120, 84 S.E. 2d 822; *In Re Hayes, supra; Snow v. Hawkes,* 183 N.C. 365, 111 S.E. 621, 23 A.L.R. 183. In *State v. Yancy,* 4 N.C. 133, Taylor, C.J., speaking of direct contempt, said, "The punishment, in such cases, must be immediate, or it would be ineffectual, as it is designed to suppress an outrage which impedes the business of the court."

G.S. 5-4 provides that the punishment for contempt by such refusal to be sworn as a witness shall be a fine not to exceed $250 or imprisonment not to exceed thirty days, or both, in the discretion of the court. Thus, the sentence of ten days in jail, imposed by the superior court in this case, was well within the statutory maximum.

It is apparent from the record that the contemner refused to be sworn due to his sincere belief that for him to take the witness stand and testify to any matters, within his knowledge concerning the matter then on trial, would violate his moral duty as a Christian minister. However, it is equally clear that his refusal was willful and intentional. With commendable patience, care, and courtesy the presiding judge explained to him that objections properly entered to questions requiring the disclosure of confidential communications to him would be sustained. It is clear that the contemner understood what was required of him by the court. His refusal to take the oath and to testify was willful and deliberate, notwithstanding the demands of his conscience which motivated it. If it was also an unlawful refusal, it constituted direct contempt, punishable summarily, and the punishment imposed was within the authority of the court.

Contempt does not necessarily proceed from a malevolent spirit. History, both sacred and secular, ancient and modern, is replete with accounts of men of noble character and lofty motives who have suffered punishment far more severe than ten days in jail for conscience' sake. History, especially in recent times, also records that the respect and acclaim which have been accorded these heroes of faith, both spiritual and political, have sometimes induced the self-seeking charlatan to follow in their footsteps — so long as the probable penalty does not outweigh the anticipated applause. Whatever the motive of the recalcitrant witness or party may be, it does not determine whether he may lawfully be adjudged in contempt and punished. The judge is also under the compulsion of conscience, and of the law, to operate the court committed to his direction in accordance with the law. To enable him to do so, he is armed by the State with the power to punish for contempt one who wilfully

and unlawfully refuses to testify when duly subpœnæd and called to the stand.

We find no merit in the contention that the sentence was originally imposed when the contemner was not represented by counsel, or in the contention that the court was under a duty to appoint counsel for him. Summary punishment for direct contempt committed in the presence of the court does not contemplate a trial at which the person charged with contempt is represented by counsel. The record shows that the contemner is a man of intelligence. As to the alleged duty of the court to appoint counsel for him, we note that he is presently represented by three able attorneys, two of whom appeared for him in the superior court on the day after sentence was imposed and presented to the court a motion that he be released upon the same grounds now argued before us. The superior court heard that motion on its merits and denied it. There is no basis for the contention that to carry out the sentence would deprive him of his liberty without due process of law on the ground that he was denied a hearing or denied representation by counsel of his choice.

We come, therefore, to the question of whether the refusal to be sworn and to testify was unlawful. It was clearly so unless it was justified by the fact that the contemner was an ordained minister who acquired his knowledge of the matters, as to which it was proposed that he be interrogated, by reason of the relationship of pastor and communicant.

The record discloses that the solicitor proposed to question the contemner only as to whether he visited the home of the defendant during or near the weekend of 4 July 1965 and there saw Cheryl Parks. The defendant, through his attorney, expressly stated that he had no objection to such testimony. We infer from the record that Cheryl Parks was the prosecuting witness. There is nothing in the record to indicate that she, the defendant's wife, or any other person interested in the case then on trial, or in the disclosure of the information in question, had any objection to the testimony of the contemner with reference to such matters.

Apart from the statute, there is no privilege with reference to communications between a clergyman, or other spiritual advisor, and his communicants or others who seek his advice and comfort. Stansbury, North Carolina Evidence, § 54; Wigmore on Evidence, 3rd ed., § 2394; 58 Am. Jur., Witnesses, § 531; 97 C.J.S., Witnesses, § 263; Comment by Dillard S. Gardner, later the Librarian of this Court, 6 North Carolina Law Review 462.

In recognition of the sociological value of free communication between one and his spiritual advisor, G.S. 8-53.1 provides:

> "No clergyman, ordained minister, priest, rabbi or accredited
> Christian Science practitioner of an established church or re-
> ligious organization shall be required to testify in any action,
> suit or proceeding, concerning any information which may have
> been confidentially communicated to him in his professional
> capacity under such circumstances that to disclose the infor-
> mation would violate a sacred or moral trust, *when the giving
> of such testimony is objected to by the communicant;* provided,
> that the presiding judge in any trial may compel such disclosure
> if in his opinion the same is necessary to a proper administra-
> tion of justice." (Emphasis added.)

It is not necessary for us, in the present proceeding, to determine
whether the mere fact of the presence of a person in a home, into
which an ordained minister has been invited in the course of his dis-
charge of his pastoral duties, is "information which may have been
confidentially communicated to him in his professional capacity"
within the meaning of this statute. It is sufficient to note, in the
present proceeding, that no objection to the proposed testimony was
or is advanced by the defendant then on trial or by any "communi-
cant" of this witness. Consequently, G.S. 8-53.1 does not afford jus-
tification for his refusal to be sworn and to testify.

The fact that one called as a witness fears that his testimony
may decrease the esteem in which he is held in the community, or
may decrease his ability to render service therein, does not justify
refusal by him to testify in response to questions otherwise proper.
See *Lassiter v. Phillips,* 70 N.C. 462; 58 Am. Jur., Witnesses, §§
34 and 35.

The contemner contends that his refusal to testify was not un-
lawful, and so did not constitute contempt of the court, because the
information desired to be elicited from him was obtained as the re-
sult of his position as a Christian minister, and to require him to
divulge this confidential information would violate his own consti-
tutional rights to the free exercise of his religion. He says that for
him to divulge the information would be in violation of his profes-
sional ethics and of his dignity as a minister of an established re-
ligion.

The Constitution of North Carolina, Article I, § 26, entitled
"Religious Liberty," provides:

> "All persons have a natural and inalienable right to worship
> Almighty God according to the dictates of their own consci-
> ences, and no human authority should, in any case whatever,
> control or interfere with the rights of conscience."

The First Amendment to the Constitution of the United States provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *"

It is well established by numerous decisions of the Supreme Court of the United States that the freedoms thus protected from congressional action by the First Amendment are so fundamental to liberty that they are also protected against state action by the Due Process Clause of the Fourteenth Amendment. See: *Board of Education v. Barnette,* 319 U.S. 624, 63 S. Ct. 1178, 87 L. ed. 1628; *Cantwell v. Connecticut,* 310 U.S. 296, 60 S. Ct. 900, 84 L. ed. 1213; *Palko v. Connecticut,* 302 U.S. 319, 58 S. Ct. 149, 82 L. ed. 288. The contemner here contends that to punish him for refusal to testify under the circumstances disclosed by this record would deprive him of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution, and, similarly, contends that it would deprive him of his liberty contrary to the law of the land in violation of the Constitution of North Carolina, Article I, § 17.

We think it clear that the term "rights of conscience" as used in Article I, § 26, of the Constitution of North Carolina, must be construed in relation to the right to worship God according to the dictates of one's own conscience. Consequently, the freedom protected by this provision of the State Constitution is no more extensive than the freedom to exercise one's religion, which is protected by the First Amendment to the Constitution of the United States. Clearly, these constitutional provisions do not provide immunity for every act which one's conscience permits him to do, or even for every act which one's conscience classifies as required by ethics, nor do they shield the defendant from a command by the State that he do an act merely because he believes it morally or ethically wrong. It is the right to exercise one's religion, or lack of it, which is protected, not one's sense of ethics.

The freedoms protected by these constitutional provisions are not limited to clergymen. Indeed, they are not limited to members of an organized religious body and, consequently, are not contingent upon proof that others share the views of the individual who asserts his own constitutional right to the freedom to exercise his religion or "right of conscience." Thus, if a clergyman, not otherwise privileged to refuse to testify, is protected from compulsion to do so by these constitutional provisions, because he believes that for him to so testify would violate his religious duty, a layman having such belief would also be protected from compulsion to testify. The con-

stitutional provisions extend their protection to the unorthodox, unusual and unreasonable belief as truly as to the belief shared by many. Thus, a holding that these constitutional provisions grant to the clergymen a privilege against compulsion to disclose upon the witness stand information given him in confidence because such disclosure would violate the clergyman's concept of religious duty, may well give rise to claims of a like privilege by laymen. The consequence might well be to deprive the courts of testimony necessary in order to administer justice, or to require them to embark upon the hazardous undertaking of determining the sincerity of the belief asserted.

The free exercise of religion is impaired not only by governmental prohibition of that which one's religious belief demands but also by governmental compulsion of that which one's religious belief forbids. *Sherbert v. Verner,* 374 U.S. 398, 83 S. Ct. 1790, 10 L. ed. 2d 965; *Torcaso v. Watkins,* 367 U.S. 488, 81 S. Ct. 1680, 6 L. ed. 2d 982; *Board of Education v. Barnette, supra.* On the other hand, the freedom to exercise one's religious beliefs is not absolute. Thus, an act of Congress forbidding the practice of polygamy in territories of the United States was sustained against the contention that the defendant's religious belief required him to practice it, *Reynolds v. United States,* 98 U.S. 145, 25 L. ed. 244, and one may be required to submit himself or his children to vaccination against a dread disease notwithstanding the fact that to do so violates his religious beliefs. *Prince v. Massachusetts,* 321 U.S. 158, 64 S. Ct. 438, 88 L. ed. 645; *Jacobson v. Massachusetts,* 197 U.S. 11, 25 S. Ct. 358, 49 L. ed. 643. In the *Prince* case, Rutledge, J., speaking for the Court, said:

> "[N]either rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the State as *parens patriæ* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death."

The use of drugs may be prohibited notwithstanding the user's asserted belief that such use is required by Divine Law. *State v. Bullard,* 267 N.C. 599, 148 S.E. 2d 565; *Shapiro v. Lyle,* 30 F. 2d

971; *State v. Big Sheep,* 75 Mont. 219, 243 P. 1067; *Sweeney v. Webb,* 33 Tex. Civ. App. 324, 76 S.W. 766.

The liberty secured by the First Amendment to the United States Constitution and by Article I, § 26, of the Constitution of North Carolina are, however, so basic and fundamental that one may not be compelled by governmental action to do that which is contrary to his religious belief in the absence of a "compelling state interest in the regulation of a subject within the State's Constitutional power to regulate." *Sherbert v. Verner, supra.* See also: *N.A.A.C.P. v. Button,* 371 U.S. 415, 83 S. Ct. 328, 9 L. ed. 2d 405; *Thomas v. Collins,* 323 U.S. 516, 65 S. Ct. 315, 89 L. ed. 430.

The effective operation of its courts of justice is obviously a "compelling State interest." *In Re Jenison Contempt Proceedings,* 265 Minn. 96, 120 N.W. 2d 515, the Supreme Court of Minnesota affirmed a conviction and sentence for contempt for the refusal of Mrs. Jenison on religious grounds to serve as a petit juror. The Supreme Court of the United States in 375 U.S. 14, 84 S. Ct. 63, 11 L. ed. 2d 39, remanded the case to the State Court for "further consideration in light of *Sherbert v. Verner,*" *supra.* When the matter came again before the Supreme Court of Minnesota in 267 Minn. 136, 125 N.W. 2d 588, 2 A.L.R. 3d 1389, that Court reversed the conviction for contempt saying:

> "Upon reconsideration we have come to the conclusion there has been an inadequate showing that the state's interest in obtaining competent jurors requires us to override relator's right to the free exercise of her religion. Consequently we hold that until and unless further experience indicates that the indiscriminate invoking of the First Amendment poses a serious threat to the effective functioning of our jury system, any person whose religious convictions prohibit compulsory duty shall henceforth be exempt."

As pointed out in the annotation in 2 A.L.R. 3d 1392, following the report of the second *Jenison* decision by the Minnesota Court, "The loss of an occassional juror does not interfere enough with the operation of the government to justify refusal to excuse one who sincerely believes that service on a jury is contrary to the tenets of his religion." An entirely different situation is presented by the refusal of a witness to testify. In many instances the witness is the only person who can give the desired testimony. The "compelling interest" of the state in the rendering of a just judgment in accordance with its law overrides the incidental infringement upon the religious belief of the witness that for him to testify is wrong.

The matter now before us arose in a trial wherein the life of

the then defendant was at stake. It happened that the contemner was called to the stand by the State, but he had also been subpœnæd by the defendant. The contemner stated that he would not testify for either side because to do so would violate his religious belief as to his duty. While such religious beliefs are not lightly to be brushed aside and overridden by the order of a court, they must yield to the "compelling interest" of the state in doing justice between the state and one charged with a serious criminal offense for which, if guilt be established, his life may be forfeited. We, therefore, hold that there was no violation of the contemner's constitutional right to the free exercise of his religion guaranteed by the First Amendment to the United States Constitution, or of his right of conscience guaranteed by Article I, § 26, of the Constitution of North Carolina, in the requirement that he give the testimony sought by the State and as to which the defendant had no objection. The refusal of the contemner to testify was contumacious and unlawful and the punishment imposed was within the authority of the superior court.

Affirmed.